**In re WALNUT ASSOCIATES, Debtor.**

**Bankruptcy No. 91–15150S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 1, 1992.

Barry D. Kleban, Adelman Lavine Gold & Levin, G. Alexander Bochetto, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for debtor.

Stanley Weinberg, Saidel, Sand and Saidel, Alan J. Davis, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for respondents.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION

The contested matter considered herein presents an excellent vehicle to explain why this court should no longer accept the assumption implicit in several of its previous decisions, notably *In re W. & L. Associates, Inc.*, 71 B.R. 962 (Bankr.E.D.Pa. 1987), that rejection of an executory contract necessarily voids or eliminates the underlying contract. Rather, we adopt the analysis presented in several recent law review articles and synthesized in *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 700–09 (Bankr.S.D.N.Y.1992), which concludes that rejection of an executory contract constitutes merely a refusal of a debtor's estate to assume a contract and accord administrative status to the claims of the non-debtor party to the contract.

This analysis diminishes the significance of the arguments of the non-debtor that the Debtor is not entitled to, or should be estopped from, avoiding the executory contract in issue, a pre-petition settlement agreement. This is because rejection does not avoid the settlement agreement, but merely renders the Debtor's damages for breach dischargeable, and possibly discharged in this bankruptcy case. Therefore, we have little difficulty in concluding that the Debtor is entitled to the narrow relief which it seeks: a declaration that the agreement in issue has been rejected. However, the consequences of this decision, which we believe are properly determined in a state-court forum where the validity and effect of the release are being litigated, appear to be less significant than the Debtor appears to have contemplated in filing the Motion before us.

B. FACTUAL AND PROCEDURAL HISTORY

Presently before this court is the Motion of WALNUT ASSOCIATES ("the Debtor") for Interpretation and Enforcement of Plan of Reorganization ("the Motion"), filed on August 7, 1992. The Debtor requests that we determine that a settlement agreement

between, on one hand, the Debtor, its former managing partners, Raymond Weisbein ("Raymond") and Jerome Weisbein, and numerous other related entities; and, on the other hand, Daniel Saidel, Jonathan Saidel, and Richard Sand, individually and t/a Saidel, Sand and Saidel, a Law Partnership, Tran States Ventures, Inc., Skyscraper Entertainment, Inc., and a few other related entities (collectively "the Saidels"), is an executory contract which the Debtor rejected pursuant to 11 U.S.C. § 365 and the terms of the Debtor's confirmed Amended Plan of Reorganization ("the Plan").

The Motion arises in connection with a voluntary Chapter 11 bankruptcy case initiated by the Debtor on September 30, 1991. At the time of the bankruptcy filing, the Debtor, a Pennsylvania limited partnership, owned and operated a large commercial office building located at 1528 Walnut Street in Center City, Philadelphia, PA ("the Building"). The Building was leased and occupied by various business entitles, including law firms, accounting firms and medical service providers.

During the two-year period immediately preceding its bankruptcy, the Debtor experienced cash flow problems and encountered difficulties in paying the expenses which arose in connection with its operations of the Building. Consequently, the Debtor was occasionally unable to supply the tenants with heat or provide building maintenance. Therefore, many of the tenants vacated the Building or withheld rental payments and the Debtor became embroiled in disputes with many of them.

One of the tenants of the Building was the Debtor's own general counsel, the Saidels' law firm. The attorney-client relationship and, later, the landlord-tenant relationship ended with some bitterness on both sides in early 1991.

In June, 1991, the Debtor initiated an action against the Saidels in the Philadelphia County Court of Common Pleas Court ("the CCP Court") seeking the payment of alleged outstanding and accelerated rental payments. On July 26, 1991, the parties executed a document entitled "Release"

("the Agreement") which provided, *inter alia,* as follows: (1) the Saidels were to pay to the Debtor and its principals the sum of $50,000 in eighteen (18) consecutive monthly installments, commencing August 1, 1992, and ending January 1, 1993; (2) the parties to the Agreement were to obtain the signing of all documents necessary to effect the Agreement; (3) all parties were to refrain from filing further legal proceedings against each other concerning the subject matter of the Agreement; and (4) all parties had continuing obligations to keep the Agreement's terms confidential, to advise third parties that they had amicably resolved their differences, and to not take any action which might adversely affect the professional status or licensing of any of the other parties thereto. Raymond, the sole witness at the hearing of September 2, 1992, on the Motion, testified that it was implicitly assumed by all parties that the validity of the Agreement was also conditioned upon the approval of General Electric Capital Corporation, the Debtor's largest, and substantially undersecured, creditor.

The Debtor and its principals apparently repudiated the Agreement shortly after it was signed because, on August 15, 1991, the Saidels filed a Motion to Enforce Settlement Agreement ("Motion to Enforce") in the CCP Court. This Motion to Enforce was pending at the time the Debtor filed its bankruptcy case on September 30, 1991, and the interested parties apparently agreed that further proceedings in that court were thereby stayed.

The Debtor's Schedules indicated that it had assets totalling $17,488,323 and liabilities totalling $36,627,406. The Debtor's Schedule B listed accounts receivable for outstanding rent due from numerous tenants of the Building, including a claim against the Saidels in the amount of $135,799.33. Schedule F listed as a contingent claims for a rental deposit, including a claim of the Saidels. None of the schedules listed the Agreement in issue as an asset of the Debtor's estate. In fact, the Debtor's Schedules made no reference to

the Agreement, and it was not listed as an executory contract on Schedule G.

On November 15, 1991, the Debtor promptly filed its initial Disclosure Statement and Plan of Reorganization. The plan provided that the Building would be sold and proceeds first applied to pay off the secured mortgage of GECC in the amount of $34,000,000. A credit bid was allowed to GECC, but, if it were successful in such a bid, GECC was to contribute $100,000 for payment to other creditors. On January 8, 1992, following a hearing, the court entered an order approving the Disclosure Statement and scheduling a confirmation hearing on February 19, 1992.

Several Objections to the plan were filed, but these were resolved by the Debtor's filing of the slightly amended Plan on February 18, 1992. Confirmation occurred without incident or opposition on February 19, 1992. As was anticipated, thereafter a GECC entity offered a successful credit bid and became the owner of the Building.

In a post-confirmation conference with counsel before the Honorable Gene D. Cohen in the CCP Court on April 1, 1992, the Debtor advised the Court that the Debtor had "emerged" from bankruptcy, that the automatic stay was therefore no longer in effect, and that, consequently, the proceedings on the Motion to Enforce could resume. On April 29, 1992, the Debtor filed an application in this court to employ special counsel to represent Debtor in connection with the Motion to Enforce. The Debtor's application was approved by this court, over the vigorous opposition of the Saidels, on June 10, 1992. Thereafter, the Debtor and the Saidels renewed the litigation of the Motion to Enforce in the CCP Court.

The Saidels allege that, on July 1, 1992, Judge Cohen denied all of the Debtor's objections to the enforceability of the Agreement except a claim based upon allegations of fraud, and ordered discovery to be completed on that claim by the end of July, 1992. According to the Saidels, the Debtor did not raise the issue that the Agreement was an executory contract which the bankruptcy case could in any way impact until after that discovery proved fruitless in establishing fraud. The Debtor then requested Judge Cohen, on July 31, 1992, to stay a decision on the Motion to Enforce pending the outcome of this Motion in this court. Judge Cohen allegedly declined and scheduled briefing on the Motion to Enforce which was to conclude by September 15, 1992. Judge Cohen has not, to our knowledge, ruled on the Motion to Enforce at this time.

The Saidels, in voluminous pre-trial submissions, argued vociferously that either the Agreement was not an executory contract or the Debtor should be estopped from rejecting it in light of its failure to highlight the Agreement in its bankruptcy papers and of its silence regarding its rejection between April, 1992, and the end of July, 1992. Implicit in these submissions is the belief that, if the Agreement *were* deemed executory and if the estoppel arguments were *not* successful, and the Agreement were deemed rejected, it would not be enforceable by the Saidels.

At our hearing on the instant Motion on September 2, 1992, the Debtor agreed that an Appendix of exhibits submitted by the Saidels could be admitted into the record. Raymond provided the only testimony. At the close of the hearing, we shared with the parties our awareness of the analysis of executory contracts adopted herein, *i.e.,* that rejection would *not* necessarily render the Agreement unenforceable. We cited the parties to the *Drexel Burnham* decision and the first in the series of three law review articles discussed at length in *Drexel Burnham*, M. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection*, 59 U.COLO.L.REV. 845 (1988) (cited hereafter as *"Andrew I"*), as authority for this analysis. The two other articles referenced in *Drexel Burnham* are M. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U.COLO.L.REV. 1 (1991) (cited hereafter as *"Andrew II"*); and J. Westbrook, *A Functional Analysis of Executory Contracts*, 74 MINN.L.REV. 227 (1989) (cited hereafter as *"Westbrook"*).

In light of the fact that this analysis appeared unfamiliar to the parties, we al-

lowed the parties to file Briefs supplementary to the initial substantial pre-hearing submission of the Saidels by September 14, 1992 (the Debtor), and September 18, 1992 (the Saidels).

In its post-hearing Memorandum, the Debtor initially argued, with some force, that the Saidels have misread the Debtor's bankruptcy filings; that the Debtor has already rejected the Agreement in the Plan-confirmation process; and that the Debtor has not proceeded inconsistently therewith. Less persuasive is the Debtor's attempt to argue that the reasoning of *Drexel Burnham* is not inconsistent with the conclusion that the "effect" of the Debtor's rejection is "avoidance," "repeal," or "cancellation" of the Agreement.

The Saidels' reply Memorandum begins and ends with its earlier estoppel arguments, but recognizes, in its midst, that what it terms the "new" *Drexel Burnham* analysis may achieve a result favorable to them even if they fail in its effort to avoid a declaration that the Agreement has been rejected.

### C. DISCUSSION

■■■ We agree with the common conclusion of *Drexel Burnham, supra,* 138 B.R. at 703; *Andrew I, supra,* 59 U.COLO. L.REV. at 861, 883, 931; *Andrew II, supra,* 62 U.COLO.L.REV. 2, 17–18; and *Westbrook, supra,* 74 MINN.L.REV. 239– 42, that rejection of any executory contract does not invalidate, rejudicate, repeal, or avoid an executory contract. *Accord, In re Modern Textile, Inc.,* 900 F.2d 1184, 1191– 92 (8th Cir.1990). Rather, the only effect of rejection is that the executory contract in issue is not assumed and the non-debtor party thereto cannot make an administrative claim against the debtor's estate if the debtor fails to fulfill the obligations of the contract. *Drexel Burnham, supra,* 138 B.R. at 703; *Andrew II, supra,* 62 U.COLO.L.REV. at 8; and *Andrew I, supra,* 59 U.COLO.L.REV. at 861.

■■■ This is not to say that rejection has no effect. It does mean that the non-debtor party to the contract subject to rejection is limited in its claims for breach to the treatment accorded to a debtor's general unsecured creditors. *See Westbrook, supra,* 74 MINN.L.REV. at 252–55, 336. It also means that, unless specific performance is available to the non-debtor party under applicable state law, the debtor cannot be compelled to render its performances required under the contract. However, if state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it.

■ To apply these conclusions to the instant controversy, we will assume, *arguendo,* that the Agreement is an executory contract and that it has been rejected. *See* pages 496–98 *infra* where we so conclude. Whether the Agreement is enforceable against the Debtor even after it has been rejected is an issue of state law. If it is not enforceable, the Debtor's rejection is immaterial, because the Agreement could not be enforced against it in any event. Since the issue of the enforceability of the Agreement against the Debtor was not raised in this court until the post-confirmation period, when our jurisdictional ties to the Debtor's legal problems has weakened; because we have not been asked to decide the issue; and because the CCP Court has proceeded well along the path of deciding this issue, it appears totally appropriate to allow that court to complete that process.

■■ Since the Debtor has rejected the Agreement, the Saidels are relegated, as to any right to monetary claims arising from the Agreement, to their distribution as general unsecured claimants against the Debtor's estate, and are otherwise discharged. However, the Saidels' non-monetary claims against the Debtor are affected only to the extent that such claims are impacted by the discharge injunction. Thus, if the matter in issue were the enforcement of a settlement agreement which required the Debtor to make a payment to the Saidels, and this obligation were discharged, a difficult issue might arise as to whether the Debtor's non-

performance were sufficiently material to render the settlement agreement unenforceable.

However, under the terms of the instant Agreement, it is only the *Saidels* who are obliged to make payments to the *Debtor*. The Debtor is required to do several things, the most important of which is to refrain from continuing to pursue the Saidels in further litigation in the CCP Court litigation or elsewhere, but not to pay money to the Saidels. If the Agreement remains enforceable under state law, after taking into consideration the Debtor's non-performance of its discharged obligations, then we believe that it remains enforceable. Again, the issue of whether the Agreement is or remains enforceable has been properly put before the CCP Court at this juncture and not this court. We can therefore say no more about the resolution of this issue at present.

■ This conclusion makes all of the other issues argued by the parties relatively insignificant. We agree with *Andrew I, supra,* 59 U.COL.L.REV. at 917–31; and *Westbrook, supra,* 74 MINN.L.REV. at 249–51, that this is appropriate, and that, in considering whether a rejected contract can be enforced against a debtor, the emphasis should be upon whether a contract term is specifically enforceable under state law rather than upon the happenstance of "executoriness." We therefore agree with these writers that the outcome of the ability of debtors and non-debtors to assert rights against each other should not turn on a concept as irrelevant to "real" state law issues as "executoriness." As in *W. & L. Associates,* 71 B.R. at 964–66, we are inclined to give a very broad reading to the definition of an "executory contract." Any contract which is not totally performed on both sides is, of course, to some degree executory. However, we are now also prepared to say that the result of cases such as *W. & L. Associates* should turn on the issue of whether, under state law, the debtor can be compelled to specifically perform in light of its acknowledged breach of the contract, rather than upon merely whether the contract is executory. We also observe

that this "new" approach may or may not ease the bankruptcy court's burden of making a hard decision; and, if we had utilized that approach in *W. & L. Associates,* it may or may not have changed the result in that case. Our burden is eased here, however, because it is fairly obvious that rejection has little, if any, impact on the enforceability of the Agreement, and determining the extent to which it does is in the hands of the CCP Court.

■ In light of these conclusions, resolution of the other issues raised by the parties recedes in significance. The first issue appears to be whether the Debtor has effectively rejected the Agreement even though it failed to list it on Schedule G of its bankruptcy papers and never formally sought to reject it in the course of its bankruptcy case.

The Debtor aptly points out that Section 7.1 of the Plan provides, in pertinent part, as follows:

> 7.1. *Executory Contracts.* Except with respect to leases in which the Debtor is lessor, any and all executory contracts which are not the subject of a motion to assume as of the date of the confirmation hearing shall be deemed rejected.

Express bankruptcy court approval is a prerequisite to assumption of a contact. *See In re University Medical Center,* 973 F.2d 1065, 1075–81 (3rd Cir.1992); and *In re Metro Transportation Co.,* 87 B.R. 338, 342 (Bankr.E.D.Pa.1988). There was never court approval of the Debtor's assumption of the Agreement. Since rejection is merely the state of non-assumption, it is clear that the Agreement, if executory, with or without consideration of Section 7.1 of the Plan, must be deemed rejected. In light of Section 7.1, the conclusion that it *was* rejected is inescapable.

■ We have little doubt that this court can properly exercise post-confirmation jurisdiction to determine whether the Agreement was in fact rejected under the Plan. A bankruptcy court retains post-confirmation jurisdiction over the debtor to " 'protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation.' " *In*

re Greenley Energy Holdings of Pennsylvania, Inc., 110 B.R. 173, 180 (Bankr. E.D.Pa.1990), quoting In re Dilbert's Quality Supermarkets, Inc., 368 F.2d 922, 924 (2nd Cir.1966). Since the Agreement is not mentioned in the Plan or even in the Debtor's Schedules, there may be some ambiguity as to whether it has in fact been rejected. Unlike the question at issue in Greenley Energy, the ambiguities which are presented in answering the question of the rejection of the Agreement arise from the text of the Plan itself, not from agreements between parties which are separate and distinct from the Plan. Therefore, our exercise of jurisdiction appears appropriate.

■ The next issue is whether the Agreement is indeed an "executory contract." The Bankruptcy Code does not define the term "executory contract." Courts addressing this issue have generally relied upon the definition set forth in V. Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 MINN.L.REV. 439, 460 (1973), that an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."

This definition was adopted by our local Court of Appeals in *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3rd Cir.1989), and is therefore binding upon us. In *Sharon Steel*, the court found that a Chapter 11 debtor could reject a natural gas utilities service agreement as an executory contract because "neither party had completed its obligation to the other under their service agreement and performance was due by both parties." *Id.* at 39. Similarly, we have held that any contract which "contemplates considerable performance from all parties thereto" is executory, *Metro Transportation, supra*, 87 B.R. at 341, and that only contracts "pursuant to which the Debtor has already received the full benefit ... from the non-debtor contractory party prior to the bankruptcy filing," *W. & L.*

Associates,. supra, 71 B.R. at 965, are excluded from that definition.

The Saidels allege that the Agreement is not an executory contact because there remains no substantial obligation to perform on the part of either themselves or the Debtor. They posit that the only remaining performances of the parties are payment on their part and accomplishment of other "ministerial" duties of both parties, e.g., the execution of certain documents by the Debtor.

We reject Saidels' argument that the Agreement is not executory. The very fact that the Saidels initiated an action to enforce the Agreement prior to the bankruptcy filing indicates that they perceived that there was a lack of performance on the part of the Debtor to the Agreement which resulted in a material breach. Furthermore, the Saidels' own failure to make payments was, in our view, a sufficiently material act of non-performance to support an action against them for a breach.

■ We join *Westbrook* in emphasizing that, since the consequences of rejection should not be very momentous, the definition of an executory contract should be very broad. 74 MINN.L.REV. at 282–85. Therefore, we find that the Agreement is an executory contract, subject to 11 U.S.C. § 365. We also hold that the Plan rejects the Agreement, as it does all executory contracts of the Debtor except the leases in which the Debtor is a lessor, which it expressly assumes.

The final issues which the Saidels raise, and to which they devote, in our view, excessive attention, are their arguments that the Debtors should be estopped from rejecting the Agreement. In these arguments, the Saidels basically contend that the Debtor should be barred from rejecting the Agreement because of its prior inconsistent actions, e.g., (1) its failure to list the Agreement as an executory contract on Schedule G and its alleged references to the Agreement as its asset, and (2) its failure to raise this issue earlier in the course of the post-confirmation CCP Court proceedings.

■ The Saidels first claim is that these actions of the Debtor should "equitably estop" it from declaring the Agreement a rejected executory contract. In *In re Atlantic Marble, Inc.*, 126 B.R. 463, 467, n. 1 (Bankr.E.D.Pa.1991), we thusly quoted 28 AM.JUR.2d 640–41 (1966), in reciting the several elements which must be proven to successfully assert equitable estoppel:

> "(1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; and (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice (footnotes omitted)."

The record and the events which have transpired in connection with this case indicate that the Saidels' equitable estoppel arguments cannot be sustained. Firstly, there is no evidence that the Debtor made any false misrepresentations. The Saidels contend that the Debtor listed the proceeds of the Agreement as an asset and now seeks to deny that assertion. A review of the Schedules reveals that the Debtor did not list the Agreement as an asset. Rather, the proceeds from the Agreement were listed as an asset on only financial statements of the debtor's partners which were annexed to the Debtor's Disclosure Statement, in furtherance of the Debtor's responsibilities of disclosure in addressing their ability to meet the requirement of 11 U.S.C. § 1129(a)(7). Further, the Debtor listed its claim for outstanding rental payments allegedly due from the Saidels (the same claim upon which its state action is based) as an account receivable in its Schedules. It also listed a refund for rental security deposit as a contingent claim by the Saidels in its Schedules. These actions indicate that, as of a date which followed the alleged consummation of the Agreement, the Debtor did *not* consider its dispute with Saidels resolved. Therefore, there is no evidence Debtor made any material misrepresentations regarding its perception of the status of the Agreement in its Schedules.

■ Secondly, the Saidels offered no evidence that they relied upon Debtor's failure to list the Agreement as an executory contract to their "detriment." The Saidels were listed as creditors and were, at least at one point, active participants in Debtor's bankruptcy case. As a law firm, they could hardly claim ignorance of the meaning and import of the contents of the Plan and other documents related to the Debtor's bankruptcy filings. They never objected to the Plan or any provision thereof despite receiving notice of the pendency of the case, and, apparently, all significant proceedings therein. Therefore, they are bound by the terms of the Plan. *See In re Szostek*, 886 F.2d 1405, 1408–10 (3rd Cir. 1989).

The Saidels rely heavily upon the decision in *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3rd Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), to support their claims of estoppel. In *Oneida*, approximately seven months after confirmation of a plan which provided for resolution of its dispute with a lender bank, the debtor initiated an action for breach of lending agreements against the bank. The Debtor had not previously revealed or listed the potential action or claims against the bank at any time during the bankruptcy proceedings. The *Oneida* court, with a dissent, held that the debtor's action must be dismissed because

> [i]n such circumstances, employment of equitable estoppel is required to preserve the integrity of the earlier proceedings, particularly where, as here, the creditors

**498**

reasonably acted in reliance upon the assumed finality and integrity of those adjudications.

848 F.2d at 418.

Here, there is no evidence that the Debtor failed to reveal that it disputed the Agreement or that it suggested that it desired to assume the Agreement or any other contract that was not expressly assumed prior to confirmation. Further, unlike the bank in *Oneida*, the Saidels, if they had taken the time to obtain clarification of same, could have made themselves fully apprised of the Debtor's position regarding the Agreement. The Plan expressly provided that all executory contracts except those in which the Debtor was a lessor, including the Agreement, were rejected. Although the Debtor's Schedule G did not list any executory contracts, including the Agreement, the Saidels were well aware that Debtor disputed the effectiveness of the Agreement prior to bankruptcy. They also become aware, after confirmation but during this bankruptcy case, that the Debtor had requested and received court approval to engage special counsel to litigate the issue of the enforceability of the Agreement in state court.

The Saidels are therefore unable to prove any false representations of the Debtor, let alone to establish the intention of the Debtor to influence the Saidels by its prior course of actions in this court. The Saidels clearly had the means to discover the "truth" of the rejection of the Agreement.

However, perhaps the most important element necessary to be proven to establish equitable estoppel which is lacking, in light of our within analysis, is any detriment to the Saidels as a result of their misperception that the Agreement had not been rejected. Since rejection does not void the Agreement, as the Saidels apparently believed in drafting their initial responsive Memorandum, they are "hollering" without being "hurt."

■ Similarly, the Saidels' arguments of judicial estoppel cannot be sustained. That doctrine "preclude[s] a party from assuming a position in a legal proceeding inconsistent with one previously asserted."

*Oneida, supra,* 848 F.2d at 419. However, as Judge Fox aptly observed in *In re Merritt Logan, Inc.,* 109 B.R. 140, 147–48 (Bankr.E.D.Pa.1990):

> the [judicial estoppel] doctrine must be applied with "caution." *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1167 (4th Cir. 1992). The general viewpoint is that the application of judicial estoppel is appropriate when the inconsistent position has been successfully asserted previously. *See Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d [208,] at 212 [ (1st Cir.1987) ]; *United States v. Webber,* 396 F.2d 381, 385–86 (3rd Cir.1968); *Scarano v. Central R. Co.* [203 F.2d 510 (3rd Cir.1953) ]. *See also Allen v. Zurich Ins. Co.,* 667 F.2d at 1167 ("Though perhaps not necessarily confined to situations where the party asserting the earlier contrary position there prevailed, it is obviously more appropriate in that situation.") (footnote omitted).

■ We disagree with the Debtor's apparent argument that all of its actions before the CCP Court and this court have been totally consistent. It does seem somewhat illogical for the Debtor to have invested any of its efforts in defending against the Motion to Enforce in the CCP Court if in fact it believed that the Agreement was invalid by effect of confirmation of the Plan. It does appear that the timing of the filing of this Motion was driven by a perception that the CCP Court case was not proceeding as hoped, and that the Debtor expected to deliver itself from that proceeding by the vehicle of this Motion. However, it is not improper to attempt to assert alternative legal arguments, even if the alternatives are inconsistent. Nor is it required that a party pursue all of its legal alternatives simultaneously. Furthermore, as the Debtor argues, its positions have not necessarily been inconsistent. The Debtor never apparently informed the CCP Court that it had assumed the Agreement in the course of its bankruptcy case. It has consistently argued, in all forums, that the Agreement is unenforceable.

■ Judicial estoppel should take hold only if the alternative positions of the party

seeking to be estopped are necessarily and irrevocably inconsistent *and* the party seeking to invoke estoppel has been harmed as a result. Thus, *Merritt Logan, supra,* suggests that judicial estoppel should be strictly applied only where the party against whom estoppel has been raised has *succeeded* in asserting an alternative position against the party invoking estoppel. The Saidels argue vigorously that the Debtor has been spectacularly *un*successful in its efforts to disclaim the Agreement in the CCP Court. Therefore, it is difficult to see how they have been unfairly injured by the Debtor's resort to the instant Motion. Again, it must be noticed that the effect of our declaration that the Debtor has rejected the Agreement does not, as the Saidels initially apparently assumed, invalidate the Agreement *per se.* Hence, the alleged inconsistency of the Debtor's positions is illusory.

We therefore conclude that the Debtor is correct in arguing that the Agreement is an executory contract which it has, through confirmation of the Plan, duly rejected. We also believe that the Debtor properly invoked this court's jurisdiction to obtain a declaration that the Agreement was rejected by it, since the parties had some grave misperceptions about not only the fact of the Debtor's rejection of the Agreement, but also the effect of same. The Debtor is not estopped from pursuing this Motion by its prior courses of conduct.

However, unfortunately for the Debtor, it misperceived the effect of rejection in requesting, in its proposed Order, that we declare the Agreement "no longer in effect." We conclude that resolution of the issue of the effect of rejection, which is likely to be minimal, must remain in the hands of the CCP Court.

D. CONCLUSION

An Order granting the Motion is attached. However, this Opinion notes the apparent lack of significance of this result in furthering the Debtor's cause.

ORDER

AND NOW, this 1st day of October, 1992, upon consideration of the Motion of the Debtor for Interpretation and Enforcement of Plan of Reorganization ("the Motion"), the Answer thereto, and the several Memoranda of Law filed by the respective interested parties relevant thereto, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED in part only.

2. It is DECLARED that the "Release" attached as Exhibit "A" to the Motion is an executory contract, and that this executory contract was duly rejected pursuant to the terms of the Debtor's Amended Plan of Reorganization attached to the Motion as Exhibit "B."

3. However, determination of the effect of the aforesaid rejection of the Agreement is deferred to the Court of Common Pleas of Philadelphia County for reasons set forth in the accompanying Opinion.