**In re WEST CHESTNUT REALTY OF HAVERFORD, INC., Debtor.**

**Bankruptcy No. 93–15996SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 7, 1995.

Joanne Semeister, Montgomery, McCraken, Walker & Rhoads, Philadelphia, PA.

Charles Golden, Edmond M. George, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA.

Frederick J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

Francis J. Lawall, Pepper, Hamilton & Scheetz, Philadelphia, PA.

Herman P. Weinberg, Herman P. Weinberg & Associates, P.C., Philadelphia, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Procedural and Factual Background

The narrow issue before the Court concerns the allowance of attorney's fees under 11 U.S.C. 506(b) to the oversecured Mortgag-

ee of the above Chapter 11 Debtor, West Chestnut Realty of Haverford, Inc. ("West Chestnut" or the "Debtor"). The Mortgagee, V. DiFrancesco and Sons ("DiFrancesco") is the holder of a first mortgage encumbering West Chestnut's principal asset—a landfill property known as the Llanarch Quarry. The two parties have been at loggerheads since the inception of the bankruptcy case, and in fact since long before that. Their relationship dates at least to July 22, 1982, when West Chestnut acquired the landfill property from DiFrancesco. The stated one million dollar purchase price consisted of $35,000 in cash and a Promissory Note in the face amount of $965,000 the latter secured by the aforesaid first mortgage. It became clear, during the course of the bankruptcy case that along with the cash and Promissory Note, a material part of the consideration for the sale consisted of certain rights granted to DiFrancesco under a stock option agreement executed contemporaneously with the promissory note and mortgage. Under the stock option agreement, DiFrancesco, generally speaking, was granted specific rights to obtain a future twenty percent (20%) ownership interest in the quarry business for a relatively nominal sum of money, or, alternatively, to be paid a relatively large sum of money upon, *inter alia*, any future sale of the quarry by West Chestnut.

West Chestnut eventually defaulted on the promissory note, prompting DiFrancesco to confess judgment thereon and, ultimately, to schedule an execution sale of the quarry property (Based on its judgment and not the collateral mortgage). On October 14, 1993, prior to any such sale, West Chestnut commenced this Chapter 11 case.

This has been a relatively contentious bankruptcy case and these two parties, in particular, have agreed on little. At the outset of the case, DiFrancesco asserted a collateral interest in the cash receipts generated by West Chestnut from its landfill customers based on the assignment of rents clause in its mortgage. The Court, in an Opinion reported at 166 B.R. 53, *aff'd*, 173 B.R. 322, determined that these "tipping fees" did not constitute cash collateral within the meaning of 11 U.S.C. § 363 and denied the DiFrancesco Motion. West Chestnut thereupon embarked upon a series of attempts to confirm a plan of reorganization. In this respect, West Chestnut had several problem creditors to contend with besides DiFrancesco. Specifically, West Chestnut had disputes with the Township of Haverford—within whose borders the Llanarch Quarry lies, as well as disputes with the owners of various adjacent residential properties. In addition, the Debtor had to contend with an active committee of unsecured trade creditors. West Chestnut ultimately succeeded in resolving its problems with Haverford Township, the neighboring property owners, and the creditors committee. Its disputes with DiFrancesco however consistently stymied its reorganization efforts. In this regard it was the stock option agreement, and not the DiFrancesco mortgage, which represented the impediment. Indeed, the treatment of the DiFrancesco secured claim essentially never varied from the treatment detailed in the Debtor's initial proposed reorganization plan; to wit: satisfaction of the mortgage debt through payment in full on the effective day of a confirmed plan.

The treatment of the stock option agreement, on the other hand, evolved over time. Initially, the Debtor, who had characterized the Stock Option Agreement as an executory contract, proposed to "reject" the option contract under 11 U.S.C. § 365, and thereby extinguish DiFrancesco's option rights, just as the rights of existing equity holders were to be extinguished under its reorganization plan. This plan failed after the Court upheld DiFrancesco's objection to the proposed treatment of its option related claim. In doing so the Court noted that while the treatment of the interests of the existing shareholders and DiFrancesco was consistent in one sense (i.e. extinguishment), DiFrancesco's treatment was highly discriminatory in another sense, since under the proposed reorganization plan existing shareholders were afforded an opportunity to acquire new ownership interests in the reorganized Debtor corporation by making contributions of "new value." This right to a continued ownership interest was not to be afforded to DiFrancesco under the Debtor's plan, yet neither did the Debtor propose any monetary

compensation to DiFrancesco for the damages it might suffer through the divestment of its option right. The latter point, i.e., no monetary compensation, was partially defensible in that the evidence adduced at related hearings made clear that the Debtor corporation had no present net worth. Thus, the present right to an ownership interest in the Debtor was worth zero. However, the entitlement of DiFrancesco to receive the substantial alternative monetary payments contemplated under the stock option agreement depended upon events which might never occur. The situation presented therefore was one wherein it was essentially impossible to quantify the value of DiFrancesco's rights (and therefore its rejection damages) under the stock option agreement. The Court nevertheless easily concluded that to permit the Debtor to reject the stock option contract and extinguish DiFrancesco's right to any future ownership interest in the business, without compensation, was reprehensibly unfair. In the face of this dilemma, the Court adopted case law which suggested that in such event the proposed rejection of an executory contract should be denied, with the contract permitted to simply pass through the Chapter 11 case unaffected. *In re Walnut Associates,* 145 B.R. 489 (Bankr.E.D.Pa. 1992).

After indications from the Court that it would deny confirmation of any plan which called for mere extinguishment of the DiFrancesco contingent equity interest "without more," the Debtor returned to its drawing board and attempted to refine its plan. Without belaboring the Debtor's various efforts in this respect, it is noted that the Debtor ultimately produced a confirmable reorganization plan which satisfactorily dealt with the DiFrancesco Stock Option Agreement, as well as certain nagging problems the Debtor had encountered along the way with respect to the absolute priority rule. During this process DiFrancesco consistently held the Debtor's "feet to the fire" by pressing for modification of the automatic stay and/or conversion of the case. While the plan process arguably took longer than it should have, particularly in light of the Debtor's unrealistic position as to the import of the stock option agreement, the automatic

stay nevertheless was left in place. In making this decision the Court relied, *inter alia,* upon the facts that 1) the DiFrancesco secured claim was indisputably over encumbered, 2) the Debtor had always operated profitably, and 3) the Debtor had forged a consensus with all other creditor classes in its case.

As noted, the Debtor's fifth amended plan of reorganization has been confirmed. Shortly prior to confirmation of the plan, in an Opinion and Order dated June 16, 1995, the Court addressed an objection to DiFrancesco's secured claim that had been filed by the Debtor some months earlier. As filed, the Debtor opposed the DiFrancesco secured claim, on a variety of grounds however, as noted at the outset hereof, the essence of the objection goes to DiFrancesco's request for the allowance of attorneys fees and costs as a part of the secured claim. In the latter respect the Debtor, and the Creditors Committee as well, filed separate written objections to the allowance of attorneys fees and costs, in each case on a variety of substantive bases. All but one of these objections to the general allowability of fees were addressed and disposed of in the Court's opinion of June 16, 1995. Specifically, the Court concluded that while DiFrancesco's right to contractual attorneys fees under West Chestnut's promissory note might no longer exist, because the note has been merged into its state court confessed judgment, an independent contractual right to recovery of certain attorneys fees and costs still existed by virtue of the *mortgage,* the lien of which survived the entry of judgment upon the note. Further, the Court concluded that authority and jurisdiction existed on the part of the Bankruptcy Court to review the propriety of DiFrancesco's fee request in its entirety; i.e., 1) for fees and costs up to an including the date upon which judgment was entered on the note, 2) for fees and costs between the date of the judgment and the commencement of the Chapter 11 case, and 3) for fees and costs incurred post-petition.

At the Court's direction, DiFrancesco has submitted to the Court and interested parties, certain time and billing records in support of its fee request. The Debtor and the

Committee, having reviewed the same, continue to assert objections to the fees in question. At this juncture all interested parties have provided memoranda of law in support of their positions, and the fee dispute issue is now ripe for decision.

### Discussion

■ As an initial matter, the Court notes that in the United States, payment of compensation to another party's counsel is generally subject to the "American Rule." This rule provides that, subject to certain limited exceptions, parties bear their own legal fees. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247–71, 95 S.Ct. 1612, 1616–29, 44 L.Ed.2d 141 (1975); *Securities & Exchange Commission v. Aberdeen Securities Co.,* 526 F.2d 603, 607 (3d Cir. 1975). The recognized exceptions to this rule were summarized in *Aberdeen Securities,* as follows:

(1) A contract or statute granting a right to attorney's fees; (2) the conferring of a common benefit by the recovery of a fund or property; (3) willful disobedience of a court order; or (4) a finding that the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *Id.,* 526 F.2d at 607 n. 9.

■ It is clear that beyond these carefully circumscribed exceptions courts do not possess "roving authority" to award counsel fees whenever they might consider it warranted. *Roosevelt Campobello Intern. Park v. Environmental Protection Agency,* 711 F.2d 431, 435 (1st Cir.1983).

■ In the instant case exception # (1) above is implicated. Specifically, and as discussed in the Court's opinion of June 16, 1995, Difrancesco, as an oversecured mortgagee of West Chestnut, is entitled to a recovery of certain attorney's fees pursuant to 11 U.S.C. 506(b) which provides as follows:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the *agreement* under which such claim arose. [Emphasis added].

As noted in the Court's June opinion, both the Note and the Mortgage in question do contain language shifting to West Chestnut certain attorney's fees that might be incurred by DiFrancesco, as follows:

*Promissory Note:*

If the Maker shall fail to pay any sum required to be paid under the terms of the Note or Mortgage or shall fail to perform any other provision hereof ... all arrearages and other sums due hereunder, shall ... become due and payable ... Upon any referral to an attorney after default to enforce any obligation hereunder or as otherwise provided by law, attorney's fees actually incurred by the Payee shall be payable by the Maker to the Payee but in no event shall this sum be less than the greater of 5% of the total amount due hereunder or $1,000. The Maker shall pay all costs of suit actually incurred by the Payee.

*Mortgage:*

Upon any referral to an attorney after default to enforce any obligation hereunder or as otherwise allowed by law, attorney's fees which are reasonable and actually incurred by the Mortgagee shall be payable by the Mortgagor to the Mortgagee but in no event shall this sum be less than the greater of 5% of the total amount due hereunder or $1,000. The Mortgagor shall pay all costs of suit actually incurred by the Mortgagee. The Mortgagor shall also pay any reasonable charges of the Mortgagee in connection with the satisfaction of this Mortgage of record.

Notwithstanding the foregoing "agreements," DiFrancesco's 11 U.S.C. 506(b) right to recovery of attorneys fees is still subject to the further requirements that 1) the fee shifting agreement invoked must be one permitted under applicable non-bankruptcy law and 2) the amount sought must be reasonable. *In re Campbell,* 138 B.R. 184, 186 (Bankr.S.D.Ohio 1991); *In re Jablonski,* 70 B.R. 381, 389 (Bankr.E.D.Pa.1987).

■ There is little room for dispute as to the first of the above two supplemental qualifications. Pennsylvania law clearly validates contractual shifting of attorney's fees. *Wrenfield Homeowner's Association, Inc. v. DeYoung*, 410 Pa.Super. 621, 600 A.2d 960 (1991). Thus, West Chestnut's agreement to pay certain legal fees, as set forth above, is enforceable. Pennsylvania law however dovetails neatly with Bankruptcy Code Section 506(b) as to the latter of the above two qualifications, in that both state and federal law require that the fees sought must in all events be *reasonable*. As noted at the outset, this issue forms an important part of the instant dispute. DiFrancesco's submissions to the Court reflect an unpaid principal balance owed of $1,120,650 plus accrued interest of $403,012.36 through June 30, 1995. DiFrancesco acknowledges payments to it (pre-petition and post-petition) in the gross amount of $192,415, which must be deducted from the foregoing. This produces a balance owed for present purposes, as follows:

| | |
|---|---|
| Principal | $1,120,650 |
| Interest | 403,012.36 |
| | $1,523,662.86 |
| (Payments) | $ (192,415) |
| Subtotal: | $1,331,247.86 |

Against this indebtedness, DiFrancesco seeks allowance of the astonishing sum of $262,705.83 in legal fees, the components of which are as follows:

| | | |
|---|---|---|
| A. | Fees incurred in connection with confessed judgment: | $ 56,032.50 |
| B. | Fees incurred post judgment but pre-petition: | $ 83,543.85 |
| C. | Fees incurred post-petition: | $123,129.48 |
| | TOTAL | $262,705.83 |

This request reflects time and billing charges for no less than thirteen separate lawyers and paraprofessionals from the law firm of Montgomery, McCraken, Walker & Rhoads, ("MMWR"). The Court has carefully reviewed the time and billing records submitted by MMWR in support of this seemingly exorbitant request, and has concluded that the instant fee request reflects charges which are in part beyond the scope of the parties agreement and, where contractually agreed to, are generally excessive. Accordingly, the fee request must be substantially reduced. This conclusion stems from a variety of reasons.

■ First, the Court notes that the fees requested by DiFrancesco in connection with the entry of judgment upon the underlying promissory note were calculated by simply multiplying the 5% factor expressed in the note to the unpaid balance thereof. The fees sought in connection with the entry of the judgment, in other words, are not based in any way on actual time and costs incurred. DiFrancesco has argued that examination of this issue is precluded at this late date because West Chestnut never proceeded under Pa.R.C.P. 2959(e) in state court with a Petition to Open Judgment. DiFrancesco further notes that various state courts have upheld the inclusion of "percentage" attorney fees awards within the context of judgments entered by confession. *Edmunds v. Jordan*, 30 Pa. D & C 114 (Lawrence Cty., 1930); *DiMaio v. Shannon*, 67 Montg.L.R. 54, 56 (1951); *Walton v. Abbot*, 57 Montg.L.R. (1940); *Fort Pitt Hardward Co. v. McCluskey Co.*, 106 P.L.J. 9 (1958); *Galligan v. Heath*, 260 Pa. 457, 103 A. 878 (1918); *Steel Iron Co. v. Jacobs*, 9 Pa.Super. 122 (1898). On the strength of these authorities DiFrancesco urges that, even if the Court determines to review the fee sought in connection with the confessed judgment, the Court should accept the inclusion of a 5% commission as *per se* reasonable. Having considered these arguments, the Court rejects them.

■ The Debtor and the Committee observe correctly that Pennsylvania Rule of Civil Procedure 2959 does not specify the precise time within which a judgment debtor must act to seek judicial review of a confessed judgment through the presentation of a Petition to Open and/or Strike Judgment. Indeed, the Debtor and the Committee are correct that a judgment entered by confession may be scrutinized and opened at any time. Thus, the mere passage of time does not act as an absolute bar to the present challenge to the legal fees included in the judgment. The abundance of caselaw construing Pa.R.C.P. 2959 in this context however, makes clear that a judgment debtor seek-

ing relief via Pa.R.C.P. 2959 must act *promptly. Haggerty v. Fetner*, 332 Pa.Super. 333, 481 A.2d 641 (1984). This is only fair, as undue delay on the part of a petitioner both undermines the finality of the plaintiff/creditors judgment and could also impair the creditor's ability to defend against the substantive allegations raised in the petition. It cannot be fairly argued that West Chestnut has acted promptly here to contest the legal fees which form part of DiFrancesco's judgment. Thus, while the Court will review the reasonableness of the legal fees sought in connection with the confessed judgment irrespective of the elapsed time, certain questions of fact which arise in that regard will be resolved in favor of DiFrancesco in determining the amount of the ultimate award.

■ The Court further rejects DiFrancesco's proposition that the 5% commission in this case is *per se* reasonable. The authorities upon which DiFrancesco relies in this respect are unpersuasive. The cases, without exception, involve relatively small principal balances such that the resultant percentage fee in question cannot be said to have been excessive. As well, certain of the cases cited involved situations wherein the Court actually *reduced* the attorney's fee percentage stated in an underlying note to a lower percentage. This fact implies little, in the Court's view, with respect to a *per se* rule that a fixed 5% attorney's fee is reasonable, but speaks volumes, on the other hand, to the notion that under Pennsylvania law, the dollar amount ultimately allowed in this context must be reasonable under the circumstances.

■ Turning to the penultimate question, the Court notes that the time and billing records submitted by DiFrancesco for fees actually incurred in connection with the entry of the confessed judgment amount to $27,-579.80, and cover a period commencing April 28, 1988 and ending September 30, 1989. Examination of the invoices furnished by MMWR reveals that a significant portion of these legal fees were incurred in negotiations aimed at restructuring the parties' transaction, or in connection with a potential resale of the quarry. They were not, in other words, incurred strictly in connection with the entry of judgment on the promissory note. This presents a conundrum which pervades the issue before the Court. As noted above, the text of the Note provides for the recovery of attorney's fees by the payee "upon any referral to an attorney after default to enforce any obligation hereunder. . . ." From this one might argue that had the maker, West Chestnut, simply paid the Note in accordance with its terms, no fees in connection with a restructure of the transaction or resale of the quarry would have been incurred; hence any and all fees incurred by the payee in this respect should be allowable because they are in furtherance of efforts to enforce the basic right to payment of the Note. While there is a syllogistic beauty to this argument, it nevertheless strikes the Court as tremendously problematic and overly expansive.

■ The argument is problematic because its adoption would make attorney's fees under a warrant of attorney an almost impossible area to police. The instant case illustrates that very point. It is an overly expansive view, moreover, because in a way, it actually amounts to awarding attorney's fees to a payee who has elected *not* to enforce a note's obligations through the entry of judgment, but has instead sought to avoid having to do so though negotiation. While out-of-court resolutions are generally favored, allowance of the fees in question on that basis would require resort to the "roving authority," proscribed by the Court in *Roosevelt Campobello International Park, supra.* Accordingly, this Court declines to award attorney fees on that basis. Rather, the Court has concluded that the fees recoverable in connection with the confessed judgment must relate to services which themselves are legitimately tied to enforcement of the Note through legal process. Having said as much, the Court notes that this is not always an easy distinction to draw. It is possible in other words, and in fact likely, that along the way, and certainly as one approaches the point in time when judgment was entered on the instant note, the legal fees in question, even if in part reflecting a continuation of settlement negotiations between the parties, are fairly characterized as having been incurred to "enforce" the note.

One might hope that the underlying time records of counsel would be of aid here. The time and billing records submitted by Di-Francesco's counsel, however, are demonstrably unhelpful in this respect, referring in some cases to "detailed billing reports" which were reported to the Court as since lost. While this is regrettable, it is this aspect of the issue, nevertheless, which will be resolved in DiFrancesco's favor, as the long interval since the rendition of the services largely excuses this omission. Taking all of the foregoing into consideration, and after careful review of the time and billing records of MMWR, the Court will allow the gross sum of $20,000 as reasonable attorney's fees to DiFrancesco in connection with the entry of judgment on West Chestnut's purchase money promissory note.

 The next and first of the two much larger components of DiFrancesco's fee request is for fees incurred between the date on which judgment was entered on the Note and the date West Chestnut commenced its bankruptcy case. DiFrancesco seeks the allowance of $83,543.83, for this period. At the outset the Court notes that entitlement to fees during this period must be predicted upon the *Mortgage* because, as discussed in the Court's opinion of June 16, 1995, the note became merged into DiFrancesco's state court judgment and no longer existed after September 7, 1989. This fact however, represents the "achilles heel" of DiFrancesco's fee request for the post judgment—prepetition period because, for the reasons which follow, the Court has concluded that it precludes recovery of the fees sought for this period in their entirety.

 The series of monthly invoices, attached as Exhibit "C" to DiFrancesco's supplemental fee application, where they contain detail at all, reflect clearly that legal services provided to DiFrancesco by its attorneys during this period involved further negotiations between the parties relative to a resale of the quarry, and later when settlement remained elusive, steps to conduct an *execution sale* on the confessed judgment. None of these activities may fairly be characterized as actions to enforce DiFrancesco's purchase money mortgage. No action in mortgage

foreclosure was ever even commenced. Indeed, and as discussed above, one can easily detect from the billing records a studied attempt on the part of DiFrancesco to avoid acting to enforce its mortgage. The reasons for this may be varied. It may be that DiFrancesco simply wanted to resolve matters amicably, or DiFrancesco might have concluded early on that the execution remedies available to it in connection with a judgment entered by confession presented a quicker, more expedient path to recovery. Alternatively, DiFrancesco might have been concerned with the potential environmental liabilities which are sometimes heard to attach to a foreclosing mortgagee via "successor" liability theories. Whatever the reasons, one searches the DiFrancesco's post judgment—pre-petition invoices in vain for any reference to services which are directed at enforcing the subject mortgage. In the Court's opinion, this is a fatal flaw and under the American Rule it precludes any award of attorney's fees for the period of time in question.

 The final component of DiFrancesco's request for the award of attorneys fees and costs under 11 U.S.C. § 506(b) is for services rendered to it by its counsel subsequent to West Chestnut's bankruptcy filing. As the Court has previously advised the parties from the Bench, certain services rendered during this period are clearly compensable. There is yet again, however, the problem of legal services which relate to matters other than the West Chestnut mortgage. As hereinbefore noted, the main battleground in the Chapter 11 case involved the stock option agreement, including specifically its character (as an executory contract), its value (for purposes of rejection damages), and its treatment under West Chestnut's five proposed reorganization plans. The same reasons which precluded the allowance of fees during the post judgment-prepetition period operate here to preclude the allowance of fees for post petition legal services which were performed to protect and defend DiFrancesco's option rights. Unfortunately for DiFrancesco, services falling into this category clearly comprise the bulk of the

post petition legal work performed on its behalf. Thus, while reasonable services related to the parties cash collateral disputes and DiFrancesco's motion for relief from the stay are compensable, the myriad of services incident to the claims estimation hearing and most of the services performed in contesting confirmation of the DiFrancesco plans of reorganization are not. A gray area exists with respect to a portion of what the Court will call general Chapter 11 administration and/or confirmation issues since a certain amount of monitoring and review of these would have been warranted in connection with the protection of DiFrancesco's mortgage interest irrespective of the existence of the stock option agreement. This latter category, however, is very limited. As noted at the outset hereof, the DiFrancesco mortgage interest was concededly overencumbered by a substantial amount and was never seriously threatened during the course of this Chapter 11 case. The need for aggressive and/or massive legal representation to adequately protect that mortgage interest simply never existed. Yet no less than thirteen MMWR professionals billed time on this matter, and did so, moreover, in sizable amounts. The Court reiterates that while in theory compensation is allowable here under 11 U.S.C. § 506(b), the amount sought must in all events be *reasonable*. In this regard the Court has concluded that even in admittedly compensable areas the amounts sought by MMWR must be reduced for instances of clear excess.

■ On this score, the time charges of Donald Kramer will be eliminated in their entirety. Mr. Kramer appears to have been the "corporate" partner who represented DiFrancesco in connection with the original sale of the quarry to West Chestnut. He apparently holds a power of attorney from DiFrancesco authorizing him to act as the latter's attorney-in-fact and principal spokesperson in matters related to the indebtedness at issue. He attended many of the hearings

during the bankruptcy case, and even took the witness stand on more than one occasion to provide fact testimony on issues germane to the stock option dispute. This latter role appears to have been the principal explanation for his presence in court throughout the case. His legal services in connection with protection of the mortgage interest do not appear to have been at all necessary in view of the fact that DiFrancesco was always simultaneously represented by capable bankruptcy counsel. Allowance of Mr. Kramer's duplicative and/or unnecessary time is accordingly unreasonable and will be denied.

■ Apart from attorney Kramer's time there is the question of attorney David Zalesne's time. Mr. Zalesne appeared late in the case as an addition to the DiFrancesco legal team. With all due respect to Mr. Zalesne's talents, his numerous appearances in court were puzzling since, as noted, DiFrancesco was consistently represented by the initial bankruptcy attorney appearing on its behalf—Joanne Semeister. This appears to be yet another incident of duplicative, unnecessary billing. Most of Mr. Zalesne's time has therefore been disallowed, either on this basis, or for the reason that his services were unrelated to enforcement of the West Chestnut Mortgage.

■ Aside from the above, the Court notes that the records submitted to the Court by MMWR contain inadequate detail, making it very difficult to pinpoint the requisite relationship between the services rendered and the touchstone for compensation, i.e., the mortgage.[1] Doubts here have been resolved *against* DiFrancesco, for the deficiencies in its record keeping, because these deficiencies exist despite two separate requests from the Court for detail, and because they may not in this instance be attributed to any delay on the part of West Chestnut. In addition to the foregoing, the Court notes with dismay that even as to compensable matters the MMWR application reflects mas-

---

1. Aside from the "fees" sought there is only the briefest itemization of the "costs" incurred by DiFrancesco, with no detail whatsoever concern-

ing the same. These "costs" have accordingly been disallowed entirely.

sive excesses on almost all fronts. For example, the application is replete with instances of duplicative charges for legal research and brief writing. There is excessive inter-office conferencing. There are charges for the unnecessary attendance of multiple attorneys at many court hearings. In short, one detects a complete absence of any sense of economy, as three and four attorneys piled on hours reviewing the same papers or researching the same issues. Having made the foregoing observations, the Court has concluded that the fee request must be sharply reduced. After appropriate deductions consistent with the foregoing, the Court is satisfied that the sum of $34,000.06 represents reasonable compensation to DiFrancesco under 11 U.S.C. § 506(b) for those necessary legal services incurred by it to enforce the obligations of the West Chestnut Mortgage subsequent to the filing of this Bankruptcy case. This amount only shall therefore be allowed as part of DiFrancesco's secured claim, producing the following total:

| | | |
|---|---|---|
| Principal | $1,331,247.86 | (principal includes the $20,000 allowed for attorney fees relating to confession of judgment on the Note) |
| Interest | 390,518.98 [2] | |
| Attorney Fees | | |
| Bankruptcy Services | 34,000.06 | |
| Less payments | (192.415) | |
| Total: | $1,372,754.04 | |

An appropriate Order follows.[3]

### ORDER

**AND NOW,** this 7th day of September 1995, upon consideration of the secured Proof of Claim filed by V. DiFrancesco & Sons, Inc. ("DiFrancesco"), as well as the Application and Supplemental Application of DiFrancesco for allowance of attorney's fees and expenses as part of its secured claim, and after consideration of the Objections thereto of the Debtor and the Official Committee of Unsecured Creditors, and after a hearing held on August 3, 1995, it is, for the reasons set forth in the accompanying Opinion, hereby:

**ORDERED** that DiFrancesco's Proof of Claim be and hereby is allowed as a secured claim in the amount of $1,372,754.40.

2. The recalculation of the attorney's fee component of the confessed judgment changes the interest calculation from that date forward which is why this figure differs from the amount set forth on page 618 *Supra.*

3. One final issue warrants brief mention. At the oral argument held in connection with this matter counsel for DiFrancesco for the first time asserted that any portion of its fee request not allowed under 11 U.S.C. 506(b) as part of its filed secured claim should nevertheless be allowed as an unsecured claim under 11 U.S.C. 502. DiFrancesco cites the Court to *Matter of 268 Ltd.,* 789 F.2d 674 (9th Cir.1986) in support of this proposition. The reasoning of the Ninth Circuit in *Matter of 268 Ltd.* is clearly sound as to the theoretical allowability of non-secured status fees under 11 U.S.C. § 502. The Appellate Court notes, however, that an 11 U.S.C. § 502 attorneys fee claimant would still be subject to state law restrictions on the contractual agreement relative to the fees in issue. Assuming, *arguendo,* that DiFrancesco may assert a claim for the disallowed fees on an unsecured basis at this date, having not previously filed a specific proof asserting this claim, the Court merely notes that the reasons expressed above would almost certainly lead it to the same result as to the disallowed portion of the fees in question.