**In re PRINTRONICS, INC., Debtor.**

**Bankruptcy No. 95–00103.**

United States Bankruptcy Court,
N.D. Florida,
Gainesville Division.

Dec. 8, 1995.

J. Michael Davis, Gainesville, FL, for Debtor.

Karen K. Specie, Gainesville, FL, Mark P. Naughton, Philip V. Martino, Rudnick & Wolfe, Chicago, IL, for Kwik Kopy.

Jim Bennett, Asst. U.S. Trustee, Tallahassee, FL.

## MEMORANDUM OF OPINION ON MOTION TO REJECT EXEC-UTORY CONTRACT

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER came on for hearing on the debtor's Motion for Authorization to Reject Executory Contract in this yet to be confirmed Chapter 11 case. The executory contract which the debtor seeks to reject is a franchise agreement between Kwik Kopy Corporation ("KKC"), franchisor, and the debtor, Printronics, Inc., franchisee. The is-sue presented by this motion is whether or not the debtor, through rejection of the Franchise Agreement, can avoid the enforcement of a covenant not to compete (the "Covenant") contained in the Franchise Agreement. Pursuant to agreement by the parties and a previous order of this court relating to KKC's motion for relief from stay in order to initiate steps to terminate the Franchise Agreement, all issues relating to the Covenant not to compete and its enforceability are to be dealt with in this proceeding. An evidentiary hearing was held on October 13, 1995, at which time I received evidence from the parties and heard argument with respect to their positions. Based on the evidence presented, and the arguments of counsel, I make the following findings of fact and conclusions of law in accordance with Rule 7052 of the *Federal Rules of Bankruptcy Procedure*.

### FINDINGS OF FACT

On July 19, 1982, William and Helen Lynch, the principals and shareholders of the debtor, Printronics, Inc., executed a KKC Franchise Agreement for a KKC franchise located in Gainesville, Florida. Prior to going into the business of operating a KKC franchise, Mr. Lynch's experience in the printing and copy field consisted mostly of serving in "in-house" graphics departments in municipal government and in private businesses. In those capacities, he was involved in the development of printing techniques and had experience in the development of quick printing operations. These activities ended in 1972 at which time Mr. Lynch began a consulting firm doing marketability studies, and this activity continued until approximately 1982. Mr. Lynch had no experience in the operation of an instant printing business other than that set forth above.

In 1982, Mr. Lynch made the decision to go into the printing business. Prior to entering into the Franchise Agreement with KKC, Mr. Lynch looked at the operations of approximately fifty (50) quick copy and instant printing businesses and interviewed five different franchisors. Based on the results of his investigation and his feeling that KKC had a superior research and development

program, Mr. Lynch chose to go with a KKC franchise.

Upon execution of the Franchise Agreement, the Lynches attended a three week orientation program given by KKC at its corporate headquarters in Houston, Texas. During the initial training, the Lynches received training and assistance regarding the management of their business, the accounting systems to be used in the business, the equipment to be purchased for the business, the pricing methodologies to be used, marketing strategies, and the appropriate store layout. The Lynches also received various written material, including materials on marketing and pricing, predesigned business forms, and catalogs for equipment and supplies. Mr. Lynch testified that KKC provided them with "excellent training in quick printing specific business applications" and that "the management training that KKC gave us ... [was] essential to our survival" during the Lynch's first year in business.

During the first couple of years of their operation, the Lynches experienced problems with both the initial location, which had been selected by KKC, and with a piece of equipment which did not operate properly. After two years, they moved the store to a new site and after three years the equipment problem was finally resolved. Since 1985, they have operated at the same site and with the same equipment as was originally placed in the center.

During the years for which the Lynches have operated, they have not been satisfied with their results as a KKC franchise. Mr. Lynch felt that the KKC trade name conveys a wrong impression to the public that the business is merely a copy center rather than a printing business. Due to the number of low cost competitors in the copy business in the Gainesville area, they could not compete for that particular segment of the business. Mr. Lynch testified that because of his background and experience in the offset printing field, he was able to provide his customers with a higher level of talent and conceptual assistance than what he viewed as the typical KKC operation. However, being restricted to use of just the KKC trade name, he felt

that he had difficulty attracting the type of business which he was seeking.

Feeling that the KKC name and logo did not appropriately reflect the nature of the business, in 1984 Mr. Lynch wrote to KKC suggesting that the corporate logo be changed to include the word "Printworks" in the name in order to convey the message that KKC did provide more than merely a copy service. While the responses Mr. Lynch received from KKC were generally positive with respect to his suggestion, apparently no action was taken.

On April 2, 1990, the Lynches assigned their rights under the Franchise Agreement to the debtor in this case, Printronics, Inc., a corporation wholly owned by the Lynches. This was accomplished pursuant to the Consent to Assignment of Franchise to Corporation Agreement and Guarantee and Agreements of Shareholders pursuant to which KKC agreed to the assignment and the Lynches personally guaranteed Printronics' obligations under the Franchise Agreement, and agreed to comply with the terms of the agreement, including the non-compete provisions.

During the period of time that they have operated the KKC, the Lynches have attended both regional and national seminars offered by KKC. They have used the "800" telephone number maintained by KKC for franchise assistance and have received monthly telephone calls from KKC offering support and inquiring about whether Printronics required any assistance with its business. They have received monthly franchise magazines from KKC and the results of surveys of KKC franchises on points of interest. At all times, they have operated with the same equipment, pricing methods, accounting methods, and store layout that they received from KKC.

Over the past three to four years, the Lynches have relied less and less on KKC for service and assistance and have endeavored to become more sophisticated based on Mr. Lynch's knowledge of technology. Mr. Lynch has suggested that KKC get involved with and take a proprietary position in some new technologies, but that suggestion was apparently not accepted. The year of 1994

was disastrous financially with changing national markets and changes in technology and competition. Sales at Printronics failed to increase and the business lost money. On April 17, 1995, Printronics filed a petition for relief under Chapter 11 of the Bankruptcy Code.

On April 18, 1995, the day after the petition was filed, Mr. Lynch sent a letter to all of his customers advising them that the name of his business was being changed from Kwik Kopy to "Great Impressions Printing and Graphics". The business continues to serve the same customers post-petition as it did pre-petition. On August 10, 1995, the debtor filed its motion for authority to reject the Franchise Agreement with KKC. Prior to that motion being filed, KKC filed a motion for relief from the automatic stay to enable it to begin the termination procedure called for in the Franchise Agreement. On August 21, 1995, a hearing was held on KKC's motion for relief from stay at which time KKC was permitted to begin the procedure for termination of the Franchise Agreement, and it was agreed that all issues relating to the validity and enforceability of the agreement would be considered at the hearing on the debtor's motion to reject the agreement. This dispute revolves around the provisions in the Franchise Agreement prohibiting the debtor from competing with KKC following termination of the agreement. The Franchise Agreement provides as follows:

12.0 RESTRICTIONS ON FRANCHISEE

FRANCHISOR and FRANCHISEE agree during the existence of this Agreement and for a period of time after termination for any reason, FRANCHISOR would be irreparably damaged in the event that FRANCHISEE should operate a competing business in the trade area of FRANCHISEE, and FRANCHISEE agrees that:

12.01 During the term of this Agreement and for a period of two (2) years after the termination of this Agreement for any reason, FRANCHISEE agrees to no be associated either directly or indirectly, by virtue of being an employee, proprietor, a partner, stockholder, agent or through family relationships with a competing instant printing business within the trade area served by the KWIK KOPY Center of this franchise;

12.02 During the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, FRANCHISEE agrees, that because of the confidential information and trade secrets received hereunder, to not be associated, either directly or indirectly, by virtue of being an employee, proprietor, a partner, stockholder, agent or through family relationships with a competing instant printing business within the trade area served by a KWIK KOPY Center Franchise;

12.03 During the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, FRANCHISEE agrees that the trade area, if not otherwise definable, shall be encompassed within an area defined by a 50–mile radius from a business location of any KWIK KOPY Center;

12.04 For a period of two (2) years after termination of this Agreement for any reason, FRANCHISEE agrees to not, either directly or indirectly, by virtue of being an employee, proprietor, a partner, stockholder, agent or through family relationships, solicit the business or make contact with customers of the KWIK KOPY Center franchised hereunder for any business purpose;

12.05 For a period of two (2) years after termination of this Agreement for any reason, FRANCHISEE agrees to not, either directly or indirectly, by virtue of being an employee, proprietor, a partner, stockholder, agent or through family relationships, persuade, entice or attempt to entice or persuade any prior employees of FRANCHISEE to discontinue employment at the location of the KWIK KOPY Center franchised hereunder; and

. . . . .

12.07 Irreparable injury. Because of the irreparable injury which will be caused by reach of any one or more of the above provisions of this Article 12, FRANCHISEE understands and agrees to issuance

of a temporary injunction by a court to protect FRANCHISOR for any breach of the above restrictions.

Other provisions of the Franchise Agreement include, in its recitals portion:

WHEREAS, FRANCHISOR, under its trade names, trademarks, logos and service marks (hereinafter referred to as "MARKS" or "trademarks") has developed KNOW–HOW (including confidential information) and promoted the identification of the mark "KWIK KOPY" for services and sale of products at instant printing and reproduction business centers; and

WHEREAS, FRANCHISOR has developed, operates and licenses a system or business program (hereinafter referred to as "PROGRAM"), including KNOW–HOW, for conducting and operating an instant printing and reproduction business under the mark "KWIK KOPY"[;] and

WHEREAS, FRANCHISOR has developed and provides services, sales development programs, and other related benefits for use by FRANCHISEES under the mark "KWIK KOPY" in the operation of an instant printing and reproduction business; and

WHEREAS, FRANCHISOR has acquired substantial goodwill and business value in its MARKS, KNOW–HOW and PRO-GRAM; [and]

WHEREAS, FRANCHISEE desires to obtain a franchise from FRANCHISOR for the right to use the mark "KWIK KOPY" and the KNOW–HOW for operating a business providing instant printing services, and to obtain the benefits and knowledge of FRANCHISOR's business program and services for the operation of an instant printing service as a KWIK KOPY CENTER under the "KWIK KOPY" mark;

4.09 **Trade Secrets.** FRANCHISOR shall disclose to FRANCHISEE, from time to time, confidential business information and trade secrets and FRANCHISEE agrees to keep such business information and trade secrets confidential and only divulge such information to employees of FRANCHISEE who have a need to know such information. Such information specif-

ically includes the manuals of FRANCHI-SOR which remain the property of FRAN-CHISOR.

On February 24, 1986, the fifty mile radius referred to in the Covenant was changed by KKC to three miles.

In seeking to reject the Franchise Agreement, the debtor desires to avoid the consequences of the Covenant and to continue to operate in its current location. If it cannot operate under its new name and in the same location, the debtor will be required to move to a new location at a cost of $20,000 to $30,000. The debtor has filed two alternate plans depending on the resolution of the issue regarding the Covenant. If the debtor is not bound by the Covenant, it proposes to pay all creditors 100% of their allowed claims while it proposes only a 50% dividend if the Covenant remains enforceable. KKC is the largest unsecured creditor with a pre-petition claim in the amount of $95,521.19.

### CONCLUSIONS OF LAW

This case involves a covenant not to compete and the effect that bankruptcy has upon it. I am presented with a Chapter 11 debtor/franchisee, Printronics, who wants to be released from a covenant not to compete obligation contained within its franchise agreement. The creditor/franchisor, KKC, argues that Printronics should not be allowed to escape an obligation by simply entering bankruptcy after receiving the benefits of KKC's tradename recognition and support services, and then compete against it.

Under its legal theories, KKC argues that the Covenant is effective after rejection of the franchise agreement, is not a claim which may be discharged by bankruptcy, and is enforceable.

Not surprisingly, Printronics argues the opposite. Not only does rejection of the franchise agreement result in termination of the Covenant, but even if it did not terminate, the Covenant is dischargeable as a claim and, in any event, is not enforceable against Printronics.

In order to sort out the issues surrounding covenants not to compete, the courts have taken various approaches such as finding: (1)

covenants not to compete are non-executory and, therefore, not eligible for rejection; (2) the effect of rejection is to relieve a debtor of its obligations under an executory contract; (3) rejection only affects the monetary rights of a creditor and does not disturb a creditor's equitable, nonmonetary rights, such as injunctive remedies; (4) debtor, because of a bad faith motive to escape its obligation under the covenant, should not be able to escape the covenant not to compete through rejection; and, (5) rejection of the franchise agreement does not terminate the covenant not to compete, instead the court must ask whether the covenant may be discharged as a claim. *See generally* Erin Brisbay McMahon, *Covenants Not to Compete: Bankruptcy Issues,* 4 J.Bankr.L. & Prac. 115, 118–21 (1995). In light of *Matter of Udell,* 18 F.3d 403 (7th Cir.1994), the last approach seems most appropriate. With the above in mind, I will discuss the arguments of the parties.

## I

 The Bankruptcy Code[1] provides a debtor-in-possession with the power to reject an executory contract. §§ 365, 1107. Printronics argues that this rejection also acts to terminate its obligations under the franchise agreement, including the Covenant. This argument, however, relies upon rejection being equivalent to termination, which it is not. The Fifth Circuit Court of Appeals noted that in Section 365 of the Bankruptcy Code, "the terms rejection, breach and termination are used differently, but not inconsistently or interchangeably, as some courts suggested." *Matter of Austin Development Co.,* 19 F.3d 1077, 1082 (5th Cir.1994) (citing *In re Giles,* 92 B.R. at 698). Throughout § 365 the term "rejection" refers to "the debtor's decisions not to assume a burdensome lease or executory contract." *Id.* Rejection of an executory contract, with some exceptions, under 365(g) "constitutes a breach." *Id.* "Three circuits, including [the Fifth], have held that this language does not mean that the executory contract ... has been terminated, but only that a breach has been deemed to occur." *Id.* (citations omitted).

"The decision to reject is thus correctly viewed *only* as a 'power to breach' the executory contract...." *Id.* at 1082 (emphasis added). As one commentator put it,

[w]hat the estate's representative is rejecting is the contract or lease asset, which conceivably could carry continuing obligations with it into the estate on an administrative basis. Rejection simply prevents the estate from unadvisedly stepping into such liabilities. The liabilities are not repudiated; to the contrary, as the rejection-as-breach doctrine is designed to insure, the contract or lease liabilities remain intact after rejection and give the non-debtor party a claim in the distribution of the estate.

*Id.* (quoting Michael T. Andrew, *Executory Contracts in Bankruptcy; Understanding "Rejection,"* 59 U.Colo.L.Rev. 845, 883 (1988)).

Furthermore, Congress has used the word "terminate" in certain subsections of § 365, yet excluded it in subsection (g). *Compare* § 365(h), (i), and (n), with § 365(g). I interpret this to mean two things: (1) Congress intended termination to be available only under limited subsections of § 365, and (2) "termination" is an option solely for non-debtors. In the instant case, Printronics, a debtor, seeks to "terminate" the franchise agreement under a subsection where Congress has not provided such a remedy. Therefore, rejection, as contemplated under the Bankruptcy Code, of an executory contract does not terminate this franchise agreement.

## II

 Printronics next argues that, even though rejection of the franchise agreement does not terminate a covenant not to compete, Printronics may, nonetheless, discharge the Covenant as a claim through treatment under its plan. However, the Bankruptcy Code only allows for discharges of debts. §§ 727(b), 1141(d), 1228, 1328. A "debt" is defined as "liability on a claim." § 101(12). I must, therefore, determine whether a covenant not to compete is a "claim" for purposes of bankruptcy. This involves considerations

---

**1.** 11 U.S.C.S. §§ 101–1330 (1994 & Supp.1995). For administrative convenience, all further references to the Bankruptcy Code will be by section number only.

of both the Code and state law. Beginning with the Bankruptcy Code, under § 101(5), a "claim" is defined as:

(A) [a] right to payment ... or

(B) [a] right to an equitable remedy for breach of performance if such breach gives rise to a right to payment....

Even though Congress had intended to define "claim" broadly, *Matter of Udell*, 18 F.3d 403, 406 (7th Cir.1994), this final version of the Bankruptcy Code limited equitable remedies as claims to only those remedies which, in the event of breach, gave rise to a right to payment. § 101(5)(B).

In *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Supreme Court considered the meaning of "giv[ing] rise to a right to payment." There, the Court held that an injunction, to clean up a pollution site, which was not performed by Kovacs but was later performed by a receiver was "effectively converted ... into a demand for money damages." *Udell* at 406 (interpreting *Kovacs* at 282). While the Supreme Court found this equitable remedy gave "rise to a right to payment" under 101(5)(B), the *Kovacs* Court "emphasized [that] it had not decided whether the [prohibitory] injunction against further pollution was also a 'claim' under § 101(5)(B)." *Id.* at 406 (citing *Kovacs* at 284, 105 S.Ct. at 710). In the instant case, the injunctive relief that KKC would seek, namely to enjoin Printronics from competing, is such a prohibitory injunction.

■ While *Kovacs* is distinguishable on its facts, it is, nevertheless, useful for this analysis. The injunction which the *Kovacs* Court held was a claim appears in substance more analogous to the specific performance example offered by the sponsor of the Bankruptcy Reform Act. The sponsor of the Bankruptcy Reform Act stated that: "[i]n some States, [in the event performance is refused,] a judgment for specific performance may be satisfied by an alternative right to payment ...; in that event, the creditor entitled to specific performance would have a "claim"...." *Id.* at 407 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6437 (remarks of Rep. Edwards)). Thus, when state law permits a right to payment as an *alternative* to an equitable remedy, a claim exists which is dischargeable in bankruptcy. *Id.*

Because the injunction which Kovacs violated, and which the receiver remedied, did give rise to a right to payment under Indiana law, it was a claim, capable of being discharged. The same cannot be said of the remedies for violating a covenant not to compete. In situations involving covenants not to compete, an injunction is not necessarily reducible to monetary damages such as in *Kovacs*. A prohibitory injunction, in which a party is ordered not to act, is the prevalent method of enforcement. Because of the very nature of the relief, these injunctions are only granted when irreparable harm can occur. *See In re Oseen*, 133 B.R. 527, 531 (Bankr.D.Idaho 1991). In order to determine whether harm would be irreparable, courts consider whether damages are ascertainable. *See Liza Danielle, Inc. v. Jamko, Inc.*, 408 So.2d 735, 738 (Fla.3d D.C.A.1982). If damages are not ascertainable, the harm is irreparable and an injunction is the appropriate remedy. *Id.* In a situation where a party violates its noncompete agreement, and in which the party within a franchise agreement had agreed that such a violation would result in irreparable harm, the agreement would dictate the appropriate remedy, as modified by applicable state law. If this remedy does not give rise to an alternative right to payment, but rather a prohibitory injunction, such a remedy would not be a "claim" as defined by the Bankruptcy Code.

■ In this case, the parties have agreed to such a provision, and, by the Franchise Agreement, have agreed that the Covenant be "interpreted and governed" by Texas law. *Franchise Agreement* Paragraph 15.06. Florida courts will recognize such a choice of law provision in a franchise agreement but will not enforce a restrictive covenant which conflicts with the public policy of the state. *Wilkinson v. Manpower, Inc.*, 531 F.2d 712, 715 (5th Cir.1976), *Davis v. Ebsco Industries, Inc.*, 150 So.2d 460 (Fla. 3rd D.C.A.1963). Thus I must first examine the effect of the Covenant under Texas law and then, I must

consider whether enforcement would be contrary to the public policy of Florida.

■ Printronics raises the argument that, under Texas law, since a franchisor can receive both damages and injunctive remedies, a breach of a covenant not to compete is not an irreparable harm but may be reduced to damages. Tex.Bus. & Com. § 15.51(a) (1995) ("Except as provided in Subsection (c) of this section, a court may award the promisee under a covenant not to compete damages, injunctive relief, or both damages and injunctive relief for a breach by the promisor of the covenant.") While it is true that § 15.51(a) allows both damages and injunctions "for a breach" of a covenant not to compete, § 15.51 does not resolve whether damages for "future" breach of a covenant not to compete is an alternative. The language of § 15.51(a) more properly means that a franchisor may recover damages for a breach that already has occurred. By reading the remedies available under § 15.51(a) in conjunction with those available under § 15.51(c)[2] (remedies available after reformation), it is logical to conclude that since only injunctive relief is available after reformation for future breaches, under Texas law, future breaches of non-reformed covenants not to compete also exclusively allow for injunctive relief. Therefore, the Covenant is not a "claim" subject to discharge. *Udell,* 18 F.3d 403. The issues of enforceability under

Florida law is discussed below, in connection with the validity of the Covenant itself.

### III

■ Printronics next argues that even if the Covenant is not a claim, the Covenant, itself, is unenforceable because it is not reasonable. Determination of enforceability of a contract is based upon state, rather than federal, law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). According to Texas law, generally, restraints on trade are unlawful unless enforceable under Tex.Bus. & Com.Code § 15.50[3]. *Light v. Centel Cellular Co.,* 883 S.W.2d 642, 643 (Tex.1994). Whether such an agreement is reasonable is "a question of law for the court." *Light* at 644. To be reasonable, the Covenant: (1) must be ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; (2) the limitations as to time, geographical area, and scope of activity to be restrained are reasonable; and (3) the limitations do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. Tex.Bus. & Com.Code § 15.50 (1995). Unlike a covenant not to compete within a personal services contract, a covenant not to compete within a franchise agreement is presumed valid unless a franchisee proves that the covenant is unreasonable. Tex.Bus. & Com.Code § 15.51(b) (1995)[4] (placing burden in non-personal services con-

---

**2.** The statute provides, in pertinent part:
(c) If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations in the covenant ... to be reasonable ..., except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief.
Tex.Bus. & Com.Code § 15.51(c) (1995).

**3.** The statute reads, in pertinent part,
Notwithstanding § 15.05 of this code, a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to

time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.
Tex.Bus. & Com.Code § 15.50 (1995).

**4.** The statute reads, in pertinent part,
(b) If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, for a term or at will, the promisee has the burden of establishing that the covenant meets the criteria specified by § 15.50 of this code. If the agreement has a different primary purpose, the promisor has the burden of establishing that the covenant does not meet those criteria. For the purposes of this subsection, the "burden of establishing" a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence.
Tex.Bus. & Com.Code § 15.51(b) (1995).

tracts upon the promisor of a covenant not to compete). Therefore, Printronics must overcome the presumption that the Covenant is valid.

In the instant case, Printronics has not challenged the fact that the Covenant is part of an enforceable franchise agreement. For that matter, Printronics does not dispute the reasonableness of the geographic or time restraints (three mile radius, two years). Nevertheless, in light of past Texas case law, I find these restraints reasonable. *Isuani v. Manske–Sheffield Radiology Group*, 805 S.W.2d 602 (Tex.App.1991) (fifteen mile radius enforceable); *Webb*, 793 S.W.2d at 305 (ten mile radius enforceable); *Property Tax Assocs., Inc. v. Staffeldt*, 800 S.W.2d 349, 350 (Tex.App.1990) (two year restriction upheld); *Webb v. Hartman Newspapers, Inc.*, 793 S.W.2d 302, 305 (Tex.App.1990) (three year restriction upheld); *Chandler v. Mastercraft Dental Corp. of Texas, Inc.*, 739 S.W.2d 460, 464–65 (Tex.App.1987) (five year restriction upheld).

Printronics, however, disputes that the scope of activity to be restrained is reasonable and that the Covenant imposes no greater restraint than is necessary to protect the goodwill or other business interest of KKC. Under the franchise agreement, Printronics cannot: 1) associate with a competing instant printing business; 2) solicit the business or make contact with the customers of the Kwik Kopy Center for any purpose; 3) entice former employees to leave the franchise; or, 4) disclose, use, or make copies of KKC's manuals or other confidential information. *See Franchise Agreement*, Paragraphs 12.01, 12.04–06. Printronics argues that it is not competing in the instant printing business, rather, it has diversified and offers dissimilar services such as graphics and complex, rather than instant, printing services. The record, nonetheless, reflects that in 1994 75% of Printronics' business comes from general printing and copying services, and that this is projected to remain about the same during the years 1995 to 1997. I find that such activities are part of the instant printing business contemplated by the Covenant which Printronics is restrained from pursuing.

Still, I must consider whether such restraints are no greater than necessary to protect KKC's goodwill or business interests. Tex.Bus. & Com.Code § 15.50 (1995). KKC suggests that its protected goodwill and business interests should be not only the goodwill of the franchise located in Gainesville but also its interest in maintaining the integrity and continuity of its franchise system, the enforcement of the covenants not to compete in its franchise agreement, and the confidentiality of its trade secret information. Whether all of these interests are protectable business interests of KKC I need not decide. Printronics' location and customers of its franchise, (from whom the debtor seeks continued business) together with KKC's trade secret information is sufficient justification for this Covenant. I, therefore, find that the Covenant is not greater than necessary to protect KKC's business interests.

■■■■ Since I find that the Covenant is enforceable under Texas law, I must also consider whether Florida would enforce such a provision. Before being enforceable, a covenant not to compete must not conflict with Florida's public policy. *Wilkinson v. Manpower, Inc.*, 531 F.2d 712, 715 (1976). Florida law specifically recognizes covenants not to compete arising from franchise or license agreements so far as they are reasonably limited as to time and area. Florida Statutes § 542.33(2)(b)[5]. While the Florida statute is not identical to the Texas statute, it is, in fact, more supportive of the enforcement of such covenants since it does not contain the explicit limitations as to the scope of activities to be restrained contained in the Texas statute. Even if Florida's statute was more

---

5. The statute provides, in pertinent part,
 (2)(b) The licensee, or any person deriving title from the licensee, of the use of a trademark and identifiable business format or system may agree with the licensor to refrain from carrying on or engaging in a similar business and from soliciting old customers of such licensor within a reasonably limited time and area, so long as the licensor, or any person deriving title from the licensor, continues to carry on a like business therein. Said agreements may, in the discretion of a court of competent jurisdiction, be enforced by injunction.
 Fla.Stat.Ann. § 542.33(2)(b) (West 1995).

restrictive, that would not necessarily mean that enforcement of the covenant would violate public policy of the state. While a Florida Statute may be considered as a declaration of Florida's public policy, a mere difference between that statute and Texas law is not enough to find Texas law contrary to Florida's public policy. *Wilkinson* at 715. Furthermore, Florida courts have not determined that § 542.33 is an "exclusive list of non-competition contracts that do not contravene public policy". *Id.* Since the Covenant here is reasonable as to time and area, its enforcement is not against the public policy of Florida.

Since the debtor has presented evidence to support a rejection of the Franchise Agreement, the debtor motion to reject will be granted. However, the Covenant not to compete contained therein shall survive the rejection and shall remain enforceable pursuant to its terms.

A separate Order will be entered in accordance herewith.

### *ORDER AUTHORIZING REJECTION OF FRANCHISE AGREEMENT*

THIS CAUSE coming to be heard upon the Debtor's Motion for Authority to Reject the Franchise Agreement with Kwik–Kopy corp. ("KKC") filed on August 8, 1995 (the "Motion"); due notice of the Motion having been given; the debtor and KKC having stipulated to this Court considering and determining all issues surrounding rejection of the Franchise Agreement, including whether the Covenant would survive rejection of the Franchise Agreement, what the effects of rejection of the Franchise Agreement would be on the Covenant, the enforceability of the Covenant and the viability of the debtor after any rejection, in the context of the motion, and having presented evidence and argument; and the court having been fully advised in these premises and having entered Findings of Fact and Conclusions of Law contemporaneously herewith, it is

HEREBY ORDERED AND ADJUDGED:

1) The debtor is authorized, pursuant to 11 U.S.C. § 365(a), to reject the Franchise Agreement dated July 19, 1982 with KKC, which rejection shall be effective as of the entry of this order; *provided however,* that such rejection shall not affect the provisions in the Franchise Agreement regarding covenants not to compete.

2) The holder of any claim arising from the rejection of the Franchise Agreement must file, and serve on the debtor, its rejection claim with this court within forty five (45) days of the entry of this order or be forever barred from asserting such claim.

3) The motion and the entry of this order constitute a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4) This is final order as that term is used in 28 U.S.C. §§ 157 and 158.

DONE AND ORDERED.