In re Ricardo E. BROWN, Jr.
d/b/a Kurupt, Debtor.

In re Rachelle Barnes FERRELL a/k/a Rachelle Ferrell a/k/a Rachelle Barnes d/b/a Aural Elixer Music Company, Debtor.

Rachelle Barnes FERRELL, Plaintiff,

v.

ROBINSON MANN CREATIVE ENTER-PRISES, INC., Arthur M. Mann, Donald T. Robinson, Defendants.

Bankruptcy Nos. 97–16006DAS,
96–11597DAS.
Adversary No. 97–0147DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

July 23, 1997.

**184**

Charles M. Golden, Obermayer Rebmann Maxwell & Hippel, L.L.P., Philadelphia, PA, for debtor.

David L. Braverman, Fellheimer Eichen Braverman & Kaskey, Philadelphia, PA, for Death Row Records.

Richard L. Sherman, Beverly Hills, CA, for Lamont & Kenneth Brumfield.

Tobey Marie Daluz, Reed Smit Shaw & McClay, Philadelphia, PA, for Sharitha Knight.

Christine C. Shubert, Tabernacle, NJ, trustee for debtor Ferrell.

Paul Maschmeyer, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for trustee Shubert.

Barry D. Kleban, Adelman Lavine Gold Levin, Philadelphia, PA, for trustee Ferrell.

James L. Allison, Duane, Morris & Heckscher, Philadelphia, PA, for Robinson Mann Creative Enterprises, Inc.

Peter C. Cilio, Federman and Phelan, Philadelphia, PA, for EMC Mortgage Co.

Warren G. Greene, Rutter, Green & Hobbs, Los Angeles, CA, for Capitol Records, Inc.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us are two similar controversies arising in the bankruptcy cases of two prominent recording artists. Both artists seek a determination that their respective rejections of certain executory contracts pertaining to their creative work products will relieve them of any obligations under those contracts.

Consistent with the principles regarding the effect of rejection of executory contracts articulated by this court in *In re Walnut Associates,* 145 B.R. 489, 494–95 (Bankr. E.D.Pa.1992), and presently, in our perception, universally accepted, we deny the artists' requests to be relieved from their contractual obligations. Alternative requests that we declare any breaches of those contracts as dischargeable debts in their respective bankruptcy cases must also be denied because, in the absence of any coherent claims of violations or potential violations of the contracts to date, such issues are not ripe for decision.

### B. FACTUAL AND PROCEDURAL HISTORY

The first of these two cases to be filed was that of RACHELLE BARNES FERRELL ("Ferrell"). Ferrell is a songwriter, producer, arranger, pianist, and extremely talented singer of jazz and popular music, who, on February 27, 1996, filed an individual voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code. However, four months later, on June 28, 1996, the case was voluntarily converted to a case under Chapter 7 of the Code.

On May 3, 1996, Ferrell filed a motion seeking to reject her alleged executory contracts with Capitol Records, Inc. ("Capitol") and Robinson Mann Creative Enterprises, Inc. ("RMCE"). The hearing on this motion was ultimately continued until July 31, 1996, but was not pursued by CHRISTINE A. SHUBERT ("the Trustee"), appointed upon conversion of the case. The final audit papers in this case, administered as an asset case by the Trustee, are due September 1,

1997. The Debtor's principal assets appear to be her rights to royalties and copyrights. The modest home in Yeadon, Pennsylvania, and automobile which were owned by Ferrell at the commencement of the case have been lost, and she presently resides in Santa Fe, New Mexico.

The instant adversary proceeding ("the Proceeding") was filed by Ferrell against RMCE and its principals, ARTHUR M. MANN, an entertainment lawyer, and DONALD T. ROBINSON, a songwriter, producer, and arranger with whom she formerly collaborated. It is entitled "Complaint for Declaratory Relief" and it seeks a declaration that, in light of the rejection of her contracts with the Defendants as a matter of law upon the failure of the Trustee to assume same within 60 days after the conversion, pursuant to 11 U.S.C. § 365(d)(1), she will be discharged from any monetary or injunctive relief sought by the Defendants pursuant to these contracts.

After two continuances, the trial of the Proceeding was conducted on June 5, 1997. The parties were accorded the opportunity to simultaneously file opening briefs by July 3, 1997, and reply briefs by July 11, 1997.

RICARDO E. BROWN, JR., d/b/a Kurupt ("Brown"), filed an individual voluntary Chapter 11 bankruptcy case on May 14, 1997. Brown is an artist who composes "gangsta rap" which has been recorded on several albums of Andre Young (professionally known as "Dr. Dre") and Calvin Broadus (professionally known as "Snoop Doggy Dogg" or "Snoop"); was a member of Snoop's backup group, Tha Dogg Pound; and contributed to the soundtrack of the movies "Poetic Justice" and "Above the Rim." Many of these albums were extremely successful, resulting in sales of albums containing his compositions and performances which were estimated by Brown to be in excess of 36,000,000 copies.

On May 16, 1997, Brown filed what he termed an Omnibus Motion to Reject Certain Management, Recording, Publishing and Production Contracts Pursuant to 11 U.S.C. § 365(a) ("the Motion"). The contracts at issue include a Recording Contract, an Exclusive Songwriting Contract, and a Management Contract with Lamont and Kenneth Brumfield ("the Brumfields;" the contracts are referenced as "the Brumfield Contracts"), dated November 30, 1991, shortly after Brown's 18th birthday; a recording contract with Death Row Record ("DRR"); a publishing contract with Suge Music, an entity owned by Marion ("Suge") Knight, the presently-incarcerated president of DRR; an Inducement Letter with Interscope Records, an entity related to DRR; and a Management Contract with Sharitha Knight ("Sharitha"), Knight's wife, all executed in January 1993.

Objections to the Motion were filed by the Brumfields, DRR, and Sharitha, although the Debtor represents that Sharitha has withdrawn her objection. The relief sought by the Motion is not only the rejection of these allegedly executory contracts, but also a declaration that none of them can be enforced against Brown and that he may seek future employment in the music industry as he chooses, without further contractual liability.

At Brown's request, the Motion was listed for an expedited hearing on June 11, 1997. At the conclusion of the hearing, being aware that the Motion presented issues similar to those presented by the Ferrell Proceeding, we ordered the parties to simultaneously file briefs on the same schedule as had been established for the Proceeding, i.e., opening briefs by July 3, 1997, and reply briefs by July 11, 1997. Of the respondents, only DRR has filed any briefs, submitting both an opening and reply brief. The Debtor filed an opening brief and a letter taking umbrage with a footnote in DRR's reply memorandum which threatened that Brown's allegations regarding DRR's failure to make accountings of earnings to him could subject him to charges of perjury.

Virtually nothing else has transpired in the case except that a status hearing of July 23, 1997, to establish a deadline for Brown to file a plan and disclosure statement has been scheduled.

The facts pertinent to Ferrell's Proceeding begin on October 26, 1987. On that date, Ferrell entered into an Exclusive Production Agreement ("the 1987 Agreement") with

RMCE. Thereafter, the 1987 Agreement was amended several times, the last of which was the date of a further Co–Administration Agreement of January 12, 1990 ("the 1990 Agreement") between the same parties. The parties agree that these contracts remained valid as of Ferrell's bankruptcy filing and require that she provide RMCE with her exclusive worldwide recording services. In exchange for and in consideration of these services, RMCE was to pay all of Ferrell's recording expenses, which were then to be recouped from any royalties payable to Ferrell.

These Agreements purport to bind Ferrell's artistic work product to RMCE through the recording of her next eight albums. The Agreements also dictate the amount of royalties to which she is entitled, which range from fifty (50%) percent for the initial album to seventy-five (75%) percent for the eighth and final album remaining under the contracts.

In addition to the aforementioned Agreements with the Defendants, Ferrell was also a party to various executory contracts with Capitol, which has filed a $673,231.33 secured claim in her case. Ferrell recorded two albums under the Capitol label, one of which, released in 1992 and described as her popular or rhythm and blues album of original songs, sold in excess of 500,000 copies and was certified gold. Her jazz album, consisting mostly of standards, was released in 1990 and has sold about 200,000 copies.

Unfortunately, in spring of 1990, the Debtor and Robinson, with whom she had successfully collaborated on her albums, had a disagreement during a recording session. The exact nature of the dispute is difficult to understand, but it arose from the Debtor's belief that Robinson was abusive, condescending, sexist, and chauvinistic in his behavior towards her. The Debtor never reconciled with Robinson, and thereafter briefly unsuccessfully attempted to work apart from him with Mann. She has refused to work with either of them for several years, expressing her refusal to perform under contracts which provide the Defendants with a substantial share of profits which would now be generated as a result of the use of her own talents,

apart from Robinson, when they had merely provided her with the funds for recording costs. She testified that she neither would, nor could, work with the Defendants because of her perception of their attitude toward and treatment of her. As a result, Ferrell testified that she has not recorded anything since the release of her two albums, rendering live performances her primary source of income. However, public interest in her has waned due to the lack of new recordings.

As a result of her agreements with the Defendants, the Debtor fears that she will never be able to revitalize her career because her options are very limited thereby. She perceives that she must either work with the Defendants, which she refuses to do, or she must pay them up to half of the profits generated from any future albums for services which they have not provided. The Debtor testified that she has avoided any violations of the contracts with RMCE by not recording for several potentially-productive years, thereby reducing her stature as a current artist in a field where production of new work is necessary to success.

Mann and (briefly) Robinson testified that they were puzzled by the cause of their alienation from Ferrell. Mann was highly complimentary of Ferrell's artistic abilities, such that he was unwilling to release her from her contractual obligations to RMCE. However, he stated that the contracts had been carefully negotiated between himself and a skilled entertainment lawyer on Ferrell's behalf, and were well within industry norms. On the other hand, recognizing that Ferrell's dissatisfaction with working under the terms of the contracts was not posturing and had adversely affected the creative processes of an artist of great talent, to the extent of greatly deflating the value of the contracts, Mann expressed a willingness to negotiate some practical resolution.

Ferrell also called Stephen Barnes, an entertainment lawyer, as an expert witness. Barnes stated that he had unsuccessfully attempted to negotiate Ferrell's release from these contracts and that their existence caused other companies in the industry to refrain from contracting with her. He also explained that even successful artists often

do not receive the fruits of their success because record companies exact their recording and marketing costs before distributing any profits to the artist. Barnes characterized Ferrell's commitment to RMCE under the Agreements as "long" in the industry.

RMCE filed a timely proof of claim in Ferrell's case indicating that same was unsecured and unliquidated. The claim states only that RMCE has a claim for rejection damages arising from Ferrell's breach of her contracts. However, no breach of these contracts other than the rejections themselves, per 11 U.S.C. § 365(g), was identified in light of Ferrell's recording inactivity. On her part, Ferrell testified that she had committed no breach and did not express any intention to do so. Per Barnes' testimony, no other figures in the industry would be likely to attempt to contract with her while this dispute was brewing and hence any breach may be, in a practical sense, impossible due to industry practices. Except for the Proceeding, there has not been any litigation among the parties or among other parties arising from these facts which was disclosed to us.

The facts of Brown's case, as well as his music, are quite different from those of Ferrell, although at bottom the same issues emerge. The hearing on the Motion, being expedited and occurring less than one month after the case filing, featured only Brown as a witness. The pertinent events have not percolated for nearly so long as those involving Ferrell and some of the facts are hazy to the court. We are nevertheless compelled to make the best that we can from the record.

Brown testified that he has no income to pay, *inter alia*, obligations to support dependent children, and has returned to live in the modest home of his mother in Sharon Hill, Pennsylvania. His career as a rap artist in Hollywood and Los Angeles is at least temporarily behind him. He left the California scene because of dissatisfaction with his status as a recipient of advances from DRR and perhaps other parties, although he admitted that it netted him $200,000 between 1993 and September 1996, a fancy car, and a fashionable apartment. However, when he believes that the money earned by his recordings, which he estimated at $36 million, should

have resulted in earned royalties in the millions of dollars. The testimony of Barnes in the Ferrell Proceeding may explain why Brown's perceptions, though logical, are in error. The Debtor also testified that he has never paid any federal income taxes on any monies received.

One difficulty identified by the Debtor's counsel is that the Brumfield Contracts appear to conflict with the DRR contracts, *i.e.*, both sets of contracts purport to constitute exclusive producing, songwriting, and recording contracts pertaining to Brown's work product for up to seven years. Not surprisingly, this apparent circumstance has produced a California state court lawsuit brought by the Brumfields against DRR, also naming Brown, the Knights, Dr. Dre, and Snoop as defendants. Other litigation in New York was mentioned, although it purportedly involves a claim against Brown regarding a song written by Brown that appears on a Tupac Shakur album.

The Debtor's Schedules list, as assets, publishing and recording rights at $250,000 and a malpractice suit against David Kenner, Esquire, arising from an alleged conflict in representing both him and the Brumfields simultaneously, valued at $1 million. Debts listed include an estimated $150,000 to the Internal Revenue Service; a $250,000 claim against him arising out of the New York litigation; and a $20 million claim against him arising out of the California litigation.

The Debtor explained that the remaining member(s) of Tha Dogg Pound have continued to perform under the aegis of DRR without him. His own efforts to obtain other recording opportunities and even to perform live were apparently halted when his contracts were discovered by promoters. As in the case of Ferrell, the Debtor's contractual obligations have apparently caused other recording industry entities to shy away from him, despite his commercial success. Apparently the Debtor perceives the bankruptcy as a means of not only eliminating this liability, but also freeing him from his contractual obligations to all other interested parties so that he can begin his career anew.

## 188

### C. DISCUSSION

The facts of the two matters before us produce a substantial number of common legal questions. However, initially, we are obliged to briefly address a few issues unique to each particular case.

### 1. BROWN IS ENTITLED TO REJECT ALL OF THE CONTRACTS AT IS-SUE.

An issue unique to Brown's Motion is whether he is in fact entitled to an order rejecting the executory contracts to which he is a party, pursuant to 11 U.S.C. § 365(d)(2). This is not an issue in the Ferrell controversy, because, as noted at page 185 *supra*, the RMCE contracts at issue there have indisputably been rejected by operation of 11 U.S.C. § 365(d)(1).

Only DRR appears to offer any opposition, regarding apparently only its own contracts. DRR's argument, consistent with the position of all other interested parties, concedes that the contracts at issue are executory, but appears to be that, because it is the largest, most successful producer of rap music in the world, it is irrational for Brown, a rapper, to seek to disavow his relationship with it. This argument is supported by DRR's statements that Brown is intellectually incapable of making a decision to reject these contracts at this stage and that this decision is based only upon his misguided belief that rejection will extricate him from these, as well as his other, contracts.

We are unimpressed with this rather paternalistic argument. As we stated in *In re III Enterprises, Inc. V*, 163 B.R. 453, 469 (Bankr.E.D.Pa.), *aff'd*, 169 B.R. 551 (E.D.Pa. 1994),

> [g]enerally, a court will give great deference to a debtor's decision to assume or reject, an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet. *See [In re] W & L [Associates, Inc.], supra*, 71 B.R. [962,] at 966 ( [ (Bankr.E.D.Pa.1987) ] ) ("We do not consider the business judgment test' to be a strict standard to meet."); and *[In re]*

*Metro Transportation, [Co.]*, 87 B.R. [338,] at 343 [(Bankr.E.D.Pa.1988)] ("We reiterate that the 'business judgment test' is not a 'strict standard to meet.' "). We will not substitute our own business judgment for that of the Debtor, nor will we disturb its decision to reject the Option unless "the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." *[In re] Hardie*, 100 B.R. [284,] at 287 [ (Bankr.E.D.N.C.1989) ]. *See also [In re ] Sundial Asphalt [Inc.]*, 147 B.R. [72,] at 81–84 [ (E.D.N.Y.1992) ].

The fact that the other party to the contract "is striving mightily to enforce it" belies the very assertion that assumption of the contract favors Brown's interests, as opposed to those of DRR itself. *Id.*

■ The Debtor's prior execution of the Brumfield Contracts, which conflict with his later DRR contracts, would in itself appear some justification for their rejection. Moreover, Brown's apparent present inability to record or perform and earn any income strongly suggests that the business judgment that he is unable to perform his end of the bargain, the classic reason for a debtor to reject an executory contract, is rational. Finally, despite the violent bluster of much of his artistic work, Brown appeared to be an intelligent and rational young man with legitimate bases to conclude that he is unwilling and unable to perform his contractual undertakings with DRR and elects not to allow DRR to make any priority claims against his estate. He is of course guided by competent bankruptcy counsel in making this judgment.

As a result, Brown clearly satisfies the low threshold necessary to show that his business judgment to reject the contracts at issue is rational. The Motion will therefore be granted insofar as Brown requests that this court order all of the aforementioned contracts to which he is a party be deemed rejected.

### 2. THE FERRELL PROCEEDING IS A CORE MATTER OVER WHICH THIS BANKRUPTCY COURT MAY EXERCISE ITS JURISDICTION.

The Defendants in the Ferrell Proceeding plead, and continue to argue, that the Pro-

ceeding is not core, and that, since Ferrell's obligations to them are allegedly not "debts," this court lacks jurisdiction to hear that matter.

██ However, the Proceeding clearly raises an issue regarding the scope of Ferrell's discharge under 11 U.S.C. § 524(a). We agree with the apparently uncontested principles well stated thusly by Judge Fox of this court in *In re Polysat, Inc.*, 152 B.R. 886, 888 (Bankr.E.D.Pa.1992):

> As the instant proceeding concerns the scope of the discharge injunction arising from sections 523 and 1141 of the Code, it is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (I) or (O). *Accord, e.g., In re Jacobs*, 149 B.R. 983, 989 (Bankr. N.D.Okla.1993); see *Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir.1990) (a core proceeding "invokes a substantive right provided by title 11 or ... is a proceeding that, by its nature, could arise only in the context of a bankruptcy case")(quoting *Matter of Wood*, 825 F.2d 90, 97 (5th Cir. 1987); *In re Mankin*, 823 F.2d 1296, 1308 (9th Cir.1987), *cert. denied [sub nom. Munn v. Duck]*, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988)) (core proceeding is based on a right derived from the federal bankruptcy law).

*Accord, e.g., In re Walker*, 180 B.R. 834, 837 (Bankr.W.D.La.1995); and *In re McNeil*, 128 B.R. 603 (Bankr.E.D.Pa.1991) (by implication). While the state courts may have concurrent jurisdiction with this court over issues regarding the scope of Ferrell's discharge, there is little doubt that this bankruptcy court is a viable jurisdictional alternative. *See In re Mitchell*, 132 B.R. 585, 586–88 (S.D.Ind.1991); and *In re Ford*, 188 B.R. 523, 526–27 (Bankr.E.D.Pa.1995), *aff'd*, C.A. No. 96–2009, 116 F.3d 467 (3d Cir. May 22, 1997).

██ The fact that we ultimately rule against Ferrell in deciding the issue of whether RMCE's alleged claims are presently subject to discharge at this time, *see* pages *infra*, is irrelevant to the issue of our jurisdiction to hear this issue. Jurisdictional power to hear and determine a matter properly arises from any colorable claim within a court's powers, irrespective of the outcome on the merits of the issue. *Cf. In re Pocono Springs Co.*, 1997 WL 347906, at *7 (Bankr. E.D.Pa. June 18, 1997) (a proceeding which implicates the automatic stay, even where no stay violations are ultimately sustained, is core).

We therefore conclude that the Proceeding is core and that it is proper for us to exercise our jurisdiction to determine it at this time.

### 3. THE DEBTORS' RESPECTIVE REJECTIONS OF THEIR EXECUTORY CONTRACTS DO NOT SUPPORT THEIR CLAIM THAT THE CONTRACTS CAN IN NO SENSE BE ENFORCED AGAINST THEM.

This court first expressed its adherence to (or, more accurately stated, its conversion to) the principles set forth in M. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. COLO. L.REV. 1 (1991) ("*Andrew II*"); M. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection*, 59 U. COLO. L.REV. 845 (1988) ("*Andrew I*"); and J. Westbrook, *A Functional Analysis of Executory Contracts*, 74 MINN. L.REV. 227 (1989), in *Walnut Associates, supra*, 145 B.R. at 494, as follows:

> We agree with the common conclusion of *[In re ] Drexel Burnham [Lambert Group. Inc.], supra*, 138 B.R. [687,] at 703 [ (Bankr.S.D.N.Y.1992) ]; *Andrew I, supra*, 59 U. COLO. L.REV. at 861, 883, 931; *Andrew II, supra*, 62 U. COLO. L.REV. [at] 2, 17–18; and *Westbrook, supra*, 74 MINN. L.REV. [at] 239–42, that rejection of any executory contract does not invalidate, [repudiate], repeal, or avoid an executory contract. *Accord, In re Modern Textile, Inc.*, 900 F.2d 1184, 1191–92 (8th Cir.1990). Rather, the only effect of rejection is that the executory contract in issue is not assumed and the non-debtor party thereto cannot make an administrative claim against the Debtor's estate if the debtor fails to fulfill the obligations of the contract. *[In re] Drexel Burnham [Lambert Group, Inc.], supra*, 138 B.R. [687] at 703 [(Bankr.S.D.N.Y.1992)]; *Andrew II, supra*, 62 U. COLO. L.REV. at 8; and *Andrew I, supra*, 59 U. COLO. L.REV. at 861.

Despite the seeming novelty of this analysis on the effect of rejection of an executory contract at the time (compare *W & L, supra,* 71 B.R. at 964–66, which we concluded, in *Walnut Associates, supra,* 145 B.R. at 495, had been decided on incorrect principles), we are unaware of any court that has not adhered to these principles since they were initially articulated. *See, e.g., In re Austin Development Co.,* 19 F.3d 1077, 1082–83 (5th Cir.1994); *In re Printronics, Inc.,* 189 B.R. 995, 1000 (Bankr.N.D.Fla.1995); *In re West Chestnut Realty of Haverford, Inc.,* 177 B.R. 501, 506 (Bankr.E.D.Pa.1995); *In re Kilpatrick,* 160 B.R. 560, 563 (Bankr.E.D.Mich. 1993); *In re Hirschhorn,* 156 B.R. 379, 388 (Bankr.E.D.N.Y.1993); *Atiyeh v. Bear,* 456 Pa.Super. 548, ——, 690 A.2d 1245, 1252 (1997); E. McMahon, *Covenants Not to Compete: Bankruptcy Issues,* 4 J. BANKR. L. & PRAC. 115, 116–18 (1995) (*"McMahon "*); R. Miller, *The Impact of Executory Contract Rejection and Discharge upon the Enforcement of a Debtor's Covenant Not to Compete,* 1995–1996 NORTON ANNUAL SURVEY OF BANKRUPTCY LAW (*"SURVEY"*) 185, 185–87 (*"Miller "*); and J. Sharer, *Noncompetition Agreements in Bankruptcy: Covenants (Maybe) Not to Compete,* 62 U. CHICAGO L.REV. 1549, 1552–53 (1995) (*"Sharer "*).

Both Debtors seemed to assume that, at the time of the filings of their respective pleadings, their respective rejections *would* in fact invalidate, repudiate, and avoid their respective contracts. At the outset of the Ferrell trial and the Brown hearing, we attempted to dissuade their respective counsel regarding the weak potential of successfully interposing that argument, in order that they could go on to other arguments. We were only partially successful in these endeavors.

Ferrell's post-trial brief leads with the argument that *In re Taylor,* 913 F.2d 102, 106–07 (3d Cir.1990); *All Blacks B.V. v. Gruntruck,* 199 B.R. 970, 973–75 (W.D.Wash.1996); and *In re Noonan,* 17 B.R. 793 (Bankr. S.D.N.Y.1982), support her position that rejection invalidates her contracts. *Taylor* and *Gruntruck* clearly do hold, at the pages referenced above, that personal service contracts, and particularly the sort of record-industry exclusive publishing and management contracts as are in issue here, can be rejected despite the presence of 11 U.S.C. § 365(c)(1)(A). However, those decisions nowhere hold that the effect of rejection of those contracts is to invalidate them. *Compare In re Carrere,* 64 B.R. 156, 160 (Bankr. C.D.Cal.1986) (pre-Andrew and Westbrook holding that rejection does not eliminate all contractual liabilities of a performer).

Ferrell then passes on to briefly arguing that Pennsylvania state courts may not enforce the rights of parties situated like RMCE, citing *McMenamin v. Philadelphia Transp. Co.,* 356 Pa. 88, 51 A.2d 702 (1947); and *Philadelphia Ball Club v. Lajoie,* 202 Pa. 210, 51 A. 973 (1902). *But see Lajoie, supra,* 202 Pa. at 219–22, 51 A. at 974–76; *Pike Rollarena, Inc. v. Clark,* 54 D. & C.2d 25 (Co.C.P.1971); and *Philadelphia Hockey Club, Inc. v. Flett,* 58 D. & C.2d 367, 372 (Co.C.P.1972). If Ferrell is correct on this point, then she should have no concerns about the efficacy of efforts of RMCE to enforce these contracts in the state courts. We also note that the issue of the enforceability of these contracts under state law is not directly raised in the pleadings. See page 192 *infra.*

Finally, Ferrell passes on to an argument which Westbrook expressed as a viable alternative to the rejection-equals-avoidance theory of attacking non-competition clauses, the argument that such liabilities may be discharged. 74 MINN. L.REV. at 275–79. We cited to Ferrell the only cases known to us where this argument had ever been accepted, *In re Ward,* 194 B.R. 703, 708–15 (Bankr. D.Mass.1996); and *Kilpatrick, supra,* 160 B.R. at 563–69. The application of this argument to the instant facts is analyzed at pages 191–193 *infra.*

We had even less success with Brown's counsel. Brown argues very aggressively that, in particular, Andrew's analysis is incorrect, contending that, unless these courts had not implicitly determined that the contracts at issue were unenforceable, the decisions in *Taylor* and *Gruntruck* were basically meaningless exercises. Also cited is *National Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482

(1984), of which it is said that, unless the Court meant to allow the debtor to avoid the labor contract in issue, the importance of decision was greatly over-emphasized. Finally, a number of the now-dated pre-Andrew and Westbrook decisions equating rejection with rescission are trotted out as if they remain good law. *See, e.g., In re Aslan,* 65 B.R. 826, 829–31 (Bankr.C.D.Cal.1986), *aff'd,* 909 F.2d 367 (9th Cir.1990); *In re Norquist,* 43 B.R. 224 (Bankr.E.D.Wash. 1984); and *In re Silver,* 26 B.R. 526, 529–30 (Bankr.E.D.Pa.1983). *See also Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1048 (4th Cir.1985). Almost as an afterthought, Brown argues that *Ward, supra; Kilpatrick, supra;* and *In re Silk Plants, Etc. Franchise Systems, Inc.,* 100 B.R. 360, 362–63 (M.D.Tenn.1989), support the conclusion that any claim against Brown under the contracts is subject to discharge.

■ We do not agree with Brown's contention that the effect of rejection, if "confined" to limiting the obligee in an executory contract to recovery of its claim in tiny bankruptcy dollars, *see Westbrook, supra,* 74 MINN. L.REV. at 252–55, is meaningless. *Compare* J. Fried, *Executory Contracts and Performance Decisions in Bankruptcy,* 46 DUKE L.J. 517 (1997) (urges elimination of "inequity" of allowing debtors to gain this economic advantage over holders of executory contracts). We also note that most contractual rights are directly adversely affected by rejection, and are effectively eliminated thereby, the only exception being when specific performance is available to the non-debtor party upon the debtor's breach under applicable state law. *See Walnut Associates, supra,* 145 B.R. at 494. It is not clear that the labor agreement at issue in *Bildisco, supra,* was subject to specific performance. In any event, the Court, in *Bildisco,* nowhere addresses the impact of its decision upon the debtor's right to avoid the contract at issue. As in our analysis of *Taylor* and *Gruntruck* at page 190 *supra,* we are unwilling to consider the failure of the respective courts to address the issue as an implied decision to ignore all recent authority on the issue of the effect of rejection, which indicates that rejection is not an avoiding power.

■ We therefore adhere to our initial conclusion that the rejection of their respective contracts at issue does not necessarily entitle Ferrell nor Brown to a further decree that they are free to enter into any other contracts; that the non-debtor contracting parties have no rights against them; nor that the contracts cannot be specifically enforced against them under applicable state law. On the other hand, we are also not prepared to conclude that, under applicable state law, the contracts *can* be specifically enforced against them. The non-debtor parties may in fact have no right to specific performance against them, as Ferrell argued. We are merely concluding that their rejection of the contracts does not, in and of itself, entitle them to treat their contracts as invalidated or avoided.

### 4. A DETERMINATION OF WHETHER THE DEBTORS CAN BE DISCHARGED OF THEIR OBLIGATIONS UNDER THE CONTRACTS, THEREBY PRECLUDING NEGATIVE INJUNCTIVE RELIEF AGAINST THEM, IS NOT RIPE FOR DECISION.

Ferrell and, to a lesser extent, Brown both pick up the argument suggested by this court as the only potential theory for releasing their respective contractual liabilities: that these liabilities are claims subject to discharge. As noted, *Ward, supra; Kilpatrick, supra;* and possibly *Silk Plants, supra,* accepted this argument in rendering judgments favorable to debtors in suits by franchisors to enjoin debtors from operating businesses in violation of restrictive covenants. Other cases have rejected this argument and concluded that the rights of parties seeking to enforce restrictive covenants are not properly classifiable as "claims." *See, e.g., In re Udell,* 18 F.3d 403, 406–10 (7th Cir.1994); *Printronics, supra,* 189 B.R. at 1000–02; and *In re Hughes,* 166 B.R. 103, 105–06 (Bankr. S.D.Ohio 1994). The law review commentaries appear to uniformly favor this position. *See McMahon, supra,* 4 J. BANKR. L. & PRAC. at 123–34; *Miller, supra,* SURVEY at 194–201; and *Sharer, supra,* 62 U. CHI-

CAGO L.REV. at 1575–81. RMCE adds an argument that the decision in *In re Torwico Electronics, Inc.*, 8 F.3d 146, 150–52 (3d Cir. 1993), holding that a state's right to enforce its environmental protection laws against a debtor does not constitute a claim, allies the Third Circuit with *Udell.*

In certain factual scenarios, the issue of whether a right to relief under an anti-competition clause of a contract constitutes a "claim" can be a very difficult issue to determine. However, we note a common factual characteristic of *Ward*, *Kilpatrick*, and *Silk Plants* which is absent here. All involved proceedings instituted by franchisors or ex-employers against debtors to enjoin discrete contractual breaches by debtors which had already occurred, and the effect of which could at least conceivably be reduced to monetary damages. By way of contrast, both Ferrell and Brown contend that they have not violated their contracts (or, perhaps more accurately, have not been allowed by the industry to ignore them). Ferrell is particularly adamant about this point. Brown's case is quite distant from discharge. In both instances, the Debtors seek to prevent non-debtor contracting parties from taking any actions to enforce their contracts even though, according to them, no damages could possibly have accrued against them as of the time of the trial/hearing because of the absence of any contractual violations.

In this light, the argument of the Defendants in the Proceeding that Ferrell's claims against (and theirs against her) are not ripe for decision bear fruit. The Supreme Court has stated that claims are not "ripe" when they "involve... contingent future events that may not occur as anticipated, or indeed may not occur at all. 13 A.C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure § 3532 (1984)." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985). A claim which is subject to "speculation and conjecture" because numerous contingencies must occur before the claim arises has been found "unripe" and not subject to review in *Whitmore v. Arkansas*, 495 U.S. 149, 157–58, 110 S.Ct. 1717, 1724, 109 L.Ed.2d 135 (1990). In order for declar-

atory relief to be appropriate, the Court has emphasized that immediacy and contemporary reality of a controversy must be present. *See Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969).

In *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153–56 (3d Cir.1995), the court posited a three-part test for ripeness in the context of a declaratory judgment action. The first requirement is that

> the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, " 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Salvation Army v., Department of Community Affairs*, 919 F.2d 183, 192 (3d Cir.1990) (quoting *Steffel v. Thompson*, 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)).

*Id.* at 1154. *See also Crestar Mortgage Corp. v. Peoples Mortgage Co.*, 818 F.Supp. 816, 818–21 & n. 5 (E.D.Pa.1993) (indemnity claim was not ripe until foreclosure sale for less than the amount of the debt had occurred; "Federal ripeness directive also counsels against adjudication of questions that might be altered or dissolved by further action in state court.").

■ It is impossible to determine what claims of RMCE against Ferrell, or the Brumfields or DRR against Brown, might arise at this juncture, or indeed whether any claims will arise at all. There have not been any contractual violations committed or claimed. The validity of Brown's contracts with the Brumfields and DRR and vis-a-vis one another are at issue in state court. Until an allegedly violative act is taken, or at least a specific action is threatened, immediacy and reality of any claims against the Debtors are purely speculative.

We therefore conclude that the claims of Ferrell and Brown that they are entitled to a discharge are not ripe for decision at this time. This conclusion is particularly so as to Brown, whose discharge is nowhere nearly imminent.

We find the issue somewhat closer as to Ferrell. Her discharge *is* imminent. The

difficulty with her presentation of this claim on this record arises, at least partially, from her initial fixation on the fruitless contention that rejection of the contracts would in and of itself terminate the contracts and all claims of RMCE against her. With a different perspective, she might be able to frame a more specific, focused, and therefore ripe issue for declaratory review. She might also have expressly joined the issue of whether RMCE's rights against her are enforceable under state law in a proceeding against RMCE squarely raising that issue.

However, the Complaint in the instant Proceeding did not squarely raise this issue and therefore the parties did not address any such claims on this record. As a result, Ferrell has not presented this issue with sufficient focus to present us with this claim, or any ripe law relating to the scope of her discharge. We are therefore obliged to deny her all of the relief which she seeks in the Proceeding. Brown will be limited to an Order deeming the contracts at issue rejected, but denying him any further relief on this Motion.

## D. CONCLUSION

An order consistent with the conclusions reached in this Opinion will be entered.